## SAM TUBB v. THE STATE.

No. 3975. Decided December 12, 1908.

Rehearing Denied March 20, 1909.

**1.—Murder—Change of Venue—Discretion of Court.**

Where the application for change of venue on the ground of prejudice was disproved by the State, and the trial court found on the question of fair and impartial trial from testimony pro and con that this ground should also be overruled, there was no error, there being no abuse of the court's discretion. Following Cox v. State, 8 Texas Crim. App., 254, and other cases.

**2.—Same—Bill of Exceptions—Motion for New Trial.**

Where upon appeal from a conviction of murder the bill of exceptions was too general and not approved by the court, the same could not be considered; however, where the objection was to a charge of the court, it could be raised in a motion for new trial.

**3.—Same—Charge of Court—Insanity—Delusion.**

Where upon trial for murder the defense under the evidence raised the issue of insanity, having the same relation to all persons, it was not required in the court's charge on insanity to present the peculiar phase of insanity which rendered the defendant irresponsible for his acts at the time of the killing of the deceased, or that he had a special delusion with reference to the deceased alone. Distinguishing Merritt v. State, 39 Texas Crim. Rep., 70; approving Hurst v. State, 40 Texas Crim. Rep., 378.

**4.—Same—Charge of Court**

See opinion for charge of court in respect to the law of insanity upon trial

for murder held to be sufficient. Following Sartin v. State, 51 Texas Crim. Rep., 571, 103 S. W. Rep., 875, and other cases.

**5.—Same—Expert Opinion—Evidence—Paranoiac.**

Upon trial for murder there was no error to show by the testimony of an expert that where a paranoiac is on trial and his insanity is plead and the witnesses testify in his presence that he is insane, he will reject and denounce them, in the courtroom and elsewhere. This was no reference to defendant's failure to testify. Following Burt v. State, 38 Texas Crim. Rep., 397.

**6.—Same—Bill of Exceptions—Motion for New Trial.**

Where a defendant objected to evidence and saved the point by bill of exceptions, it is not required that the same matter should again be urged in the motion for new trial to make its review in the Appellate Court possible.

**7.—Same—Bill of Exceptions—Practice on Appeal.**

Where upon trial for murder the defendant objected to the testimony of an expert as to what defendant's conduct would be in case he would have pleaded insanity, the Appellate Court will not treat the matter in an abstract sense merely, but as the matter would have been understood by the jury, and will not disregard the bill of exceptions because it failed to set out the matter fully, as contended by the State.

**8.—Same—Evidence—Bill of Exceptions—Harmless Error.**

Where an objection goes to the whole testimony involving a number of different statements, some of which are admissible and some inadmissible, and there is nothing in the objection or bill of exceptions to direct the challenge or single out the objectionable testimony, such bill of exceptions should not be considered on appeal; besides where such testimony though subject to criticism is not of such importance as to require reversal, there was no error.

**9.—Same—Jury and Jury Law—Opinion of Juror.**

Where upon trial for murder the only defense was insanity, and the defendant objected to a certain juror because the latter had expressed an opinion with reference to the general issue of guilt of the defendant; and the juror upon voir dire stated that he would try the defendant fairly and impartially and in accordance with the law and the evidence, there was no error in overruling defendant's challenge. Following Adams v. State, 35 Texas Crim. Rep., 285, and other cases.

**10.—Same—Evidence—Opinion of Witness.**

Where upon trial for murder the court correctly received the evidence as to the opinion of witnesses in respect to the sanity of the defendant, there was no error.

**11.—Same—Evidence.**

Upon trial for murder there was no error in permitting the jailor who had defendant in custody to state his observation of the defendant while in jail, with reference to his plea of insanity, and that defendant said that he did not wish to shave, that he might need his whiskers; no injury to defendant's right having been shown.

**12.—Same—Charge of Court—Murder in Second Degree—Manslaughter.**

Where defendant was convicted of murder in the first degree there was no error that the court charged on murder in the second degree and manslaughter, although the court was not required under the evidence to charge on manslaughter.

**13.—Same—Insanity—Sufficiency of the Evidence.**

Where upon trial for murder the only defense was insanity, and that issue was submitted to the jury under a proper charge of the court, a conviction of murder in the first degree will not be disturbed.

Appeal from the District Court of Anderson. Tried below before the Hon. B. H. Gardner.

Appeal from a conviction of murder in the first degree; penalty, imprisonment for life in the penitentiary.

The opinion states the case.

*Miller & Royall* and *Campbell, Sewell & Strickland,* for appellant. —On question of court's charge on insanity: Erwin v. State, 10 Texas Crim. App., 700; Merritt v. State, 39 Texas Crim. Rep., 70, 45 S. W. Rep., 21. On question of change of venue: Dobbs v. State, 51 Texas Crim. Rep., 629, 103 S. W. Rep., 918; Cason v. State, 52 Texas Crim. Rep., 220, 106 S. W. Rep., 337; Alarcon v. State, 47 Texas Crim. Rep., 415, 83 S. W. Rep., 1115. On question of witness' opinion on insanity: Holcomb v. State, 41 Texas, 125; Webb v. State, 5 Texas Crim. App., 596; Williams v. State, 53 S. W. Rep., 859. On question of challenge of juror: Cason v. State, 52 Texas Crim. Rep., 220, 106 S. W. Rep., 337; Hudson v. State, 28 Texas Crim. App., 323; Holland v. State, 31 Texas Crim. Rep., 345.

*F. J. McCord,* Assistant Attorney-General; *T. J. Harris,* District Attorney; *H. I. Myers* and *N. B. Morris,* for the State.—On question of overruling motion for change of venue: Connell v. State, 46 Texas Crim. Rep., 259, 75 S. W. Rep., 512; Earles v. State, 85 S. W. Rep., 1; Adams v. State, 93 S. W. Rep., 116; Renfro v. State, 42 Texas Crim. Rep., 393. On question of opinion of witness as to defendant's insanity: Gaines v. State, 37 S. W. Rep., 331. On question of expert testimony: 1 Wharton and Stille's Med. Jur., page 840, section 1051, 5 Ed. On question of challenge of juror: Wilkerson v. State, 57 S. W. Rep., 956. On question of charge of court on insanity: Cases cited in opinion.

RAMSEY, JUDGE.—Appellant was indicted in the District Court of Anderson County on a charge of murder, and on trial was convicted of murder in the first degree and his punishment assessed at confinement in the penitentiary for life. That he shot and killed Dave Pierce on the 30th day of January, 1907, is not denied, nor is there any pretense of justification for his having so done. The facts are that he lived and had lived for many years near the town of Frankston, in Anderson County; that sometime in the fall of 1907 he had bought from the Campbell Machinery Company a gasoline engine and wood sawing outfit, under an agreement that he should pay $125 in cash on the machinery being set up in a good working order and the remainder of the purchase price in consignments of cord wood. About the 26th or 27th of January, D. W. Huff went to the town of Frankston to see appellant in regard to a settlement of the outfit so purchased. Mr. Huff called on appellant, and, as

he states, showed him that the machinery was in perfect working order and that appellant seemed well pleased with it; that he then asked him about the payment of $125; that appellant did not seem to want to make any settlement, and he asked him if he was going to fulfill his contract, to which appellant replied, not now; not yet, but that he would see him up at the hotel, and that he did come there to see him; that he went to his room in the hotel and that Huff fixed up the note for him to sign, and appellant said he would have to see his son before he could do anything and would see him in the morning, and that if he did not see him in town he could come out to the mill where the machinery was; that he went out next morning and found him nailing up the doors and windows of the house containing the machinery, when he asked appellant if he did not think he ought to make a settlement of some kind, or turn the machinery over to him, to which appellant replied that he could not do it as he had sold it. That in accordance with instructions received from the house with the necessary accompanying papers he called on Mr. Pierce and gave him the sequestration writ and bond of indemnity, and that he started with Pierce to the house where the machinery was, but as it was raining they went to appellant's residence; that his son invited them in and asked them to have a seat by the fire; that they made some inquiry of the son as to where appellant was, and were advised that he was down in the field getting up some cattle; that they remained there some fifteen or twenty minutes, about the expiration of which time, Mr. Huff says, he heard a noise which he took to be a dog running off the steps, and that just after this he heard what he thought was a key grating in the lock of a door through which they had just entered; that very soon after this appellant appeared in the doorway leading into the dining room; that he heard a quick tread at the door and looking up saw appellant come in with a shotgun in his hands; that appellant said, "what are you sons-a-bitches doing in my house?" that the minute appellant came in he had a bead drawn on Pierce, and just the minute he made the above remark he fired; that after some other efforts to escape witness jumped on a bed, and closing his eyes and ducking his head he rushed through a window and dropped to the ground and ran; that appellant pursued him with his gun and called on him to halt, which he finally did; that appellant came up where he was and he told him that he had done nothing, and that that was his way of earning a living, and for him to remember that he, witness, had a wife at home; that appellant then said to him, "well, damn you, then come back here and I will not hurt you." That he marched witness in front of him, and when they got to the yard gate near the barn he told his son to open the gate and let him, witness, in, when he started to go and appellant said to him, "Now you go," and he started to go and appellant then said to him, "Hold

on; come back here and pay me for that window you broke." Witness asked him how much he wanted, and he said it was two dollars; that he took it out of his pocket and went to hand it to appellant when he said, "Don't do that; lay it down on that stump;" that he laid it down on the stump and appellant said, "Now you go;" that he continued pointing the gun at him as long as he was in sight, and that as soon as he got out of sight he immediately ran with all possible speed. Huff says that at the time Pierce was shot he had his hands folded in his lap and was reading a magazine; that he, Huff, did not have any weapon on his person and that Pierce had the sequestration papers with him which he had given him. There was no evidence to disprove any part of the testimony of Huff in respect to the circumstances of the shooting; there was no plea or claim of justification, nor was there any evidence of ill-will or malice on the part of appellant towards deceased.

The defense in the case was insanity, and to prove this much testimony was introduced. While it is claimed by the State that this testimony was largely that of kinspeople of appellant and others open to attack, there was a great amount of testimony of numerous witnesses, which, as we view it, raised a serious question as to the insanity of appellant. This is rendered to our minds more cogent in view of the peculiar circumstances surrounding the homicide. That appellant was a singular and an eccentric man no one can read this record and not believe. That he was something more than this was stated by many of the witnesses and is strongly urged by appellant's counsel. Among other witnesses produced by appellant was Judge A. B. Watkins, who stated that he knew appellant well; had represented him in court a number of times; that among other things that impressed him as strange and unusual was the fact of appellant consulting him about the propriety of committing suicide in order to collect an insurance policy; that as witness believed and had observed appellant's controlling impulse had always been to swindle someone, anybody with whom he came in contact, at any time; that he seemed to want to get hold of anything, even if it was useless; that he did not discriminate between his friends and those to whom he was under no obligation; that he had said a hundred times in the last few years that appellant was a monomaniac on that one subject; that it was out of proportion to any other idea he had; that it was uppermost in his mind; that he believed appellant was sane on any other subject, except that one of swindling people out of their property; that he believed him to be a monomaniac; that he believed he had reached that point that he had come to feel that it was all right for him to beat anybody out of anything, and that he had a right to beat them out of it; that he believed that appellant's idea was that to interfere with him in that line, was just like interfering with him in anything else that he had a right to do; as much as the plowing of corn, or the interference with any

other property right of his. He further states that appellant appeared to him the whole time, that is, since 1884, to be almost as bad as a maniac upon that subject; that he really looked upon him as an unfortunate person, a moral degenerate. Many singular and peculiar acts of appellant were proven on the trial. It seems that on a couple of occasions he came to the house of one W. B. Beacham and got breakfast, and woke up the family and announced that breakfast was ready, and that this was his conduct the first time he had ever been at his house; that in conversation he would change the subject a half dozen times in a short while, and that he could never understand what he wanted. It is shown by another witness who had known appellant some thirty or forty years that in going in company and to church, appellant would attire himself in a long linen duster and an old hat, and that in working in the fields he had known him to sew up his trousers so tight that he could not get them off and would have to sleep in them; that he always seemed to have a desire to go up; that he wanted to go up to a higher pitch, and if his plans failed it seems that he just floundered, and would throw himself away, which caused the witness to believe that he was off and that something was wrong with him; that this peculiar disposition was noticeable even when he was a boy, and that his conduct led him to believe that his mind was impaired even then. Another witness who had known him for many years testified that it was noticeable that in the midst of a conversation he would stop and stare out of the window, drop his head for a few minutes and presently start off on a new subject. Mrs. Cook testified to seeing him burn brush at night and that when his wife was a corpse and they were sitting up with her she noticed that appellant would take his baby and walk around the room real fast, singing to the baby and finally laid down on the floor and went to sleep; that the baby was not fretting, and that she did not commonly see people acting that way on such occasions. W. A. Lamb testified to an incident in connection with a visit appellant paid him last winter when he noticed that appellant had a string tied around his body and that he asked him why he wore it there, and appellant replied that it was as warm as an overcoat and that he believed that his mind was unbalanced. Jim Owens testified to a number of unusual incidents, and among other things to the fact that appellant had quite a lot of goats at one time, and that he got bells for all of them and belled them; that he had fourteen or fifteen cows and he put bells on all of them. Henry Houston testified that on one occasion he had met appellant on the public road going to Athens; that he was by himself driving in a buggy with no clothes on but an undershirt and drawers, and his drawers legs were rolled up; that about fifteen years ago appellant came to his house one night where his father lived, who was a physician, and wanted his tooth pulled; that his father told him it was dark and that he could not do it at night; that he insisted on

having it pulled then, and that he took his pistol out of his pocket, and took one of the cartridges out, and suggested that he could cut a groove in that and attach one end of a fine piece of wire to the cartridge by that groove, and slip that back in the pistol, and tie the other end to his tooth and, as he said, "shoot the damn thing out." That he never thought appellant was rational, but never decided what was the cause of his condition; that he was very peculiar about associating with other people; that he would have nothing to do with other people, but always stayed to himself; that he had been at appellant's house and saw there a great many unusual things for a man in his station, and that he told witness that he had beat people out of them; that he had such things as flower pots, crockery ware, farm tools, etc.; that he never talked about anything else except beating people out of things; that if he was interfered with it seemed to bother him very much; that he never in his life knew appellant to be disturbed by anything else. Another witness testified that many years ago appellant told him one day that he wanted to get married and was going to steal the girl and wanted witness to get the license right away; that he went to Palestine and got the license, and when he returned he met appellant and the young lady, and, as he says, they gave him the regular "horse laugh;" that he gave appellant the license and he began to tear it up; that about this time appellant bought a very fine overcoat, for which he paid $125 or $150; that he would wear it around anywhere, sometimes wearing it with overalls and brogan shoes; that he was a great hunter, and would sometimes be in the woods by himself two or three days, and when his provisions ran out and the dogs got tired of hunting, he would shoot a cow and cut off its hind quarters and feed it to the dogs; that he would leave the balance of it there, and post up a notice on a tree, that on that day Sam Tubb had killed a cow, with a certain brand, and that the same would be paid for when the owner called on him; that about three years ago appellant visited him at Texarkana, and on entering the house hugged and kissed him and his wife, though they were not related; that when bedtime came he showed appellant his room, but he said "no," that he was going to sleep with me, and that if witness did not sleep with him that he would sleep with him and his wife; that this occurred the next night also; that he had a letter from him about a year ago in which he wanted witness to pick out some fine horses for him and send him their photographs. That he had worked with appellant in a store many years ago and that during this time he made a pen out of one of his fingernails; that it was an actual pen, shaped just like a falcon pen, and split in the middle; that he would write with that as legibly as he could with anything else. It was shown by other witnesses that he scarcely used this hand at all. Witness states that on one of his visits to Texarkana he took him to church; that his daughter took a seat three or four rows ahead

of them; that when he noticed her sitting where she was appellant went to where she was, right over the benches, instead of going out into the aisles; that this was done right before the whole congregation. Dr. A. S. Miller, who was a cousin of appellant, testified to some very singular incidents, and gives a very full history of appellant and his antecedents. He knew appellant, it seems, as a boy, at which time he says he did not act, think or talk like other boys; that he was always doing something erratic and out of the ordinary; that about the time he got grown he found that appellant was ordering goods, fine horses, fine dogs, fine guns and everything in the world that he could get that was very fine, and that he got a great many of them; that he, witness, told him that he was doing wrong, but it did not seem to bother appellant; that he thought it was right to get them. That appellant once insisted on giving him two fine pigs, and that he told appellant that he did not want them, but finally took them to please appellant; that in a day or two appellant sent him a bill for twenty dollars for them. From his observation of appellant through many years, he says: "I can not tell you when this condition of his mind first arose; I think he was born with it, and it has been with him all the time since then. It is a deficiency of some special faculty; it might be of the conscience—a deficiency in construction of mental character, or consciousness." It seems from Dr. Miller's testimony that appellant was reared by an uncle who had plenty of money and who supplied him with everything he wished; that appellant was wasteful, and that when anything did not suit him he would break it and get another. He diagnosed the disease under which he claimed appellant was suffering as paranoia and in conclusion stated that "under the circumstances, as developed by the evidence in this case, a paranoiac would kill one who was attempting to levy on some property. I think that he would kill a man, and if he did, he would think it was right." Another witness testified that while at work plowing he would take off his clothes and put them on the gear for blinds and pads; that he had a great many dogs, and one time he bought some butter and eggs from him, witness, and said he was going to give his dogs a Thanksgiving dinner and invited him to come over and take dinner with him, appellant, and his dogs; that he frequently rambled around at night, and slept very little; that he would sometimes be out blowing his horn and sometimes on the road. Sam Cooper testified to a conversation with appellant on the morning of the killing; that this occurred about 7:30 o'clock; that he drove by in a buggy going to mill and that appellant ran out of a little house where the machinery was and asked him if he was a lawyer; that he, appellant, said that these fellows were going to take his real estate; that he was going to box that house up and nail himself up in it, so that they could not get it away from him; that appellant seemed to be laboring under a terrible delusion of some kind, and that he, wit-

ness, did not believe him to be a sane man; that after this conversation appellant turned and ran away from him. G. W. L. Smith testified to another singular incident. He states that he lived at Henderson, where he was Deputy United States Internal Revenue Collector; that quite awhile ago he was at Frankston making some investigations and met appellant; that he was there again sometime after that and appellant came up and said: "You don't know me," and that he told him he did not remember him when he said his name was Tubb; that sometime after that he got a letter from Frankston from appellant, telling him that he was glad to know that he was not dead; that the letter was a very long rambling letter, in which he expressed a good deal of sympathy and solicitude for him. William Cook testified that he had seen appellant in town bare-headed and wearing a strap around his waist; that he .awoke one night and saw a fire down in his clearing and the next morning found that he had been burning brush all night. Another witness testified that she had seen him plowing on Sunday morning; that she had seen him come to town bare-headed and bare-footed. S. H. Adams testified that he had known appellant for some twenty-five years; that the first peculiar conduct on appellant's part. was in 1884 or 1885, when he came one night to the town of Kickapoo to a Christmas tree on a very cold night where there was a crowd, wearing a linen duster and no coat; that in 1895 he was in the hardware business at Athens, and appellant came in and said he wanted to see some coffins; that he showed him the best coffin he had and he wanted it trimmed up, and that he told appellant the ornament would get soiled and not look nice, but he decided to take it and witness started to close it up; that appellant said, "Hold on, I want to measure it," and stepped into the coffin and tried it; that appellant wanted him to keep it, which he did, until he went out of business. Mrs. Mary Goodson testified that she had known appellant all of her life; that she had seen him take his dogs into his wife's room and put them on her nice bed, and cover them up with her nice counterpanes, and take food from the table and give it to them, saying that they had a chill, or were sick; that she had talked to him about the way he would do, about getting things, but he did not seem to think it was wrong; that he seemed to think it was all right to get things and not pay for them; that he never talked about anything else, and seemed to derive a great deal of satisfaction from discussing that subject. Another witness who had known appellant many years said that one of his peculiarities was to go around at different times of the night to people's houses; that he had known him to come to his house when he was asleep; that once he came and wanted to get a handful of peas that he had promised him; that he, witness, told him they were in the smoke-house, and that he went out there and got them and began shelling them before he could get up; that this was after midnight and a very

cold night; that he had made such a visit to his house only about three or four weeks before the killing, coming before daylight and leaving before daylight; that he came on horseback and left afoot.

There was considerable evidence of insanity, at least in the collateral branches of appellant's family, and some slight evidence of insanity in the more direct line which we deem it unnecessary to set out. Jim Burkett testified to an incident when he and other parties were out hunting, one of whom was riding what he calls a "fool mule;" that he had some pine kindling tied on behind his saddle and appellant said to strike a light, setting fire to this kindling as he said that; that before the fellow knew anything about it his mule was gone right down the bluff of the mountain. S. J. Ayres, who had known appellant all his life, states that he did not know that appellant could be compared with any other human being; that in his early life he had a mania for guineas and collected some 150 guinea eggs, and that after the guineas were hatched he would set his dogs on the guineas and run them; that he had often hunted with him, and on such expeditions if it did not suit him to go home when he, witness, was ready, he would lie right down in the leaves and go to sleep, and that he had many similar eccentricities. Joe Rowe testified that many years ago appellant came to his house late at night when it was very cold; that he got up, let him in, made a fire and asked him what was the matter, and he said he came over to bring some nails, and that he would have to get up and get them; that he told him to give them to the boy, and he said if he, witness, did not get up he would throw them into the fire, and took about a dozen nails out of his pocket, threw them into the fire and bade them good-night; that a few weeks before the homicide appellant came over to his house and said he wanted to see him, witness, on some business and for him to come over to his house; that when he went over appellant just told him howdy and went on; that he went to the lot and came back and passed right by him, witness, on the gallery, and never came back where he was; that a few days after that witness passed appellant on his way to town and appellant told him to wait that he had never told him what he wanted to see him about; that he wanted to see him; that he was at the time about twenty-five or thirty steps from the road and seemed to be digging in the ground with a hatchet; that he sat there on his horse for a half or three quarters of an hour; that appellant was bare-headed and digging in the ground; that finally he quit and passed right by witness without saying a word and left him there. There are many other instances of a similar character narrated by several witnesses. Appellant introduced a number of experts, among others Dr. W. L. Barker, Superintendent of the Insane Asylum at San Antonio, who concurred in the belief and opinion that appellant was a paranoiac and who expressed the belief, basing his judgment upon all the testimony which he had heard,

that appellant was insane and not capable of distinguishing between right and wrong in respect to the particular act with which he was charged.   Many of the nonprofessional witnesses gave a similar opinion, while others were not prepared to say that he was so insane as to be irresponsible, but some of them, at least, were inclined to the opinion that he would know the difference between right and wrong in respect to the matter charged.

The State introduced a number of witnesses who testified to a more or less intimate acquaintance with appellant, and who expressed the belief that he was sane and responsible for the act charged, and on the particular issue of the defense, in respect to the form of insanity with which, as appellant's witnesses stated he was suffering, the State, it seems to us, met with much success, that is, the contention that appellant was a paranoiac.   It seemed to have been conceded by all the professional witnesses that paranoia is a progressive disease, and as stated by them in harmony with medical authorities, is characterized by systematised delusions, and that the paranoiac ordinarily manifests a mental disorder, which is seen in three grades or phases.   In the first place it is said the patient passes through a period of disquietude, in which he begins to realize that he is out of harmony with his environment.   He is uneasy and dissatisfied; he becomes introspective, and subjects himself to analysis in an attempt to interpret his disorderly feelings and thoughts. This, it is said, has been called the hypochondriacal stage; that he is in possession of his intelligence and realizes that he is not in accord with others.   In the second stage he passes on to the formation of delusions of suspicion and of persecution; he believes that he is the object of evil design of other persons; that he is talked about and maligned; that he is shunned; his plans thwarted; that he is unjustly dealt with, defrauded of his rights, tormented by unknown and unseen foes; that tormenting voices call to him repeating aloud his innermost thoughts.   In the third stage it is stated the patient undergoes what has been called the transformation of personality; that he either gradually or quite suddenly conceives delusions of grandeur; that heretofore persecuted and rejected of men he now arises superior to fate, his adverse fate becomes exalted.   It was shown by the testimony of Judge Watkins, as well as others, that there had been little, if any, change in the attitude, demeanor or conduct of appellant for something like a quarter of a century; there was some proof, including that of Dr. Miller, that there had been some change, but it was slight, and the testimony, taken altogether, if the definitions agreed upon by the physicians are correct, seem to us, as laymen in that profession, to have given the State a strong position in the matter of the particular classification of the mental disorder agreed upon by them.   But with all this it is clear to us that there was strong evidence by the nonprofessional witnesses of such mental unsoundness as to not only carry the case to the jury but

to demand in respect thereto the careful safe-guarding of every right which the law accords to a defendant. We have made this probably unnecessary full statement of the case to the end that our remarks in respect to particular assignments may be understood and applied. There are many questions raised on the appeal, some of which relate to matters which are so unimportant that in view of the necessary length of the opinion, we shall find it unnecessary to treat.

1. When the case was called for trial appellant made an application for change of venue. This application contained both the statutory grounds that there existed in the county of Anderson, where the case was pending, so great a prejudice against him that he could not obtain a fair and impartial trial, and because there then and there existed against him a dangerous combination instigated by influential persons by reason of which he could not expect a fair trial. There was not only no proof introduced in support of the second ground of the motion, but, on the contrary, the State, taking the initiative, this allegation was subsequently disproved. On the other issue in question that there existed so great a prejudice against him that he could not obtain a fair and impartial trial in Anderson County, a considerable number of witnesses were introduced both by appellant and the State, which testimony we do not deem it necessary to set out. That the case had been discussed to a considerable extent, and that there had been among some persons a judgment formed adverse to appellant in respect to the case, a reading of the record abundantly testifies. A considerable number of witnesses introduced by the State, and on cross-examination a number of witnesses introduced by appellant testified that they believed that appellant could in said county secure a fair and impartial trial. Of necessity in respect to a question of this kind much ought to be left to the discretion and sound judgment of the court trying the case, and in no case should the judgment of conviction be set aside on account of the action of the trial court in refusing a change of venue unless it is clear that such court has abused his discretion. This is the doctrine laid down in almost the precise terms above stated by Judge Hurt in the case of Gaines v. State, 37 S. W. Rep., 331. See also Cox v. State, 8 Texas Crim. App., 254; Bohannon v. State, 14 Texas Crim. App., 271; Martin v. State. 21 Texas Crim. App., 1; Connell v. State, 75 S. W. Rep., 512; Reeves v. State, 83 S. W. Rep., 803; Earles v. State, 85 S. W. Rep., 1; Adams v. State, 93 S. W. Rep., 116. After a careful inspection of the record, we do not believe that we could or would be justified, in view of the action of the trial court in conflicting evidence, in reversing the judgment on the failure of the court to grant a change of venue.

2. It is urged that the court erred in that he failed to charge the jury upon the phase of insanity presented by the defense in said cause, and failed to charge the peculiar phase or form of monomania which rendered the appellant irresponsible for his acts

at the time of the killing of deceased, and that the court did not charge the law applicable to the facts, as presented by the appellant on the question of insanity. Objection is made to our considering this assignment for the reason that same is not properly presented. Appellant in the court below undertook to file an exception to the charge of the court on this question. It can not be considered for two reasons. In the first place, the purported exception is so general as that it would not in the nature of things have challenged the attention of the court or directed his attention to the respect wherein his charge was thought to be insufficient. Again, an examination of the record discloses the fact that what is termed a bill of exceptions was in fact never approved by the court. However, the matter is, we think, properly raised in appellant's motion for a new trial.

3. In the third ground of the motion for a new trial, such new trial was sought because "The court erred in that he failed to charge the jury upon the phase of insanity presented by the defense in said cause, and failed to charge the peculiar phase of monomania, which rendered defendant irresponsible for his acts at the time of the killing of deceased, his attention having been thereto called by special exception at the time." While somewhat vague, we believe the effect of this ground of the motion is in such language as could not have been misunderstood to challenge the charge of the court and furnishes a basis for the review of this contention by us. The court in his general charge in respect to the law of insanity, gave the following: "You are charged that only a person with a sound memory and discretion can be held punishable for a crime, and that no act done in a state of insanity can be held punishable as an offense. Every man is presumed to be sane until the contrary appears to the jury trying him. He is presumed to entertain, until this appears, a sufficient degree of reason to be responsible for his acts; and to establish a defense on the ground of insanity, it must be shown by a preponderance of the evidence that at the time of committing the act, the party accused was laboring under such defect of reason, from disease or defect of mind, as not to know the nature or quality of the act he was doing; or if he did know that, he did not know he was doing wrong, that is, that he did not know the difference between the right and wrong as to the particular act charged against him. The insanity must have existed at the very time of the commission of the offense, and the mind must have been so dethroned of reason as to deprive the person accused of a knowledge of the right and wrong as to the particular act done. You are to determine from the evidence in this case the matter of insanity, it being a question of fact, controlled, so far as the law is concerned, by the instructions herein given you. In case you find from the evidence that the defendant was insane at the time of the commission of the act, and you acquit him, under the instructions

heretofore given you, you will state in your verdict that you have acquitted the defendant on the grounds of insanity, and the burden of proof to establish his plea of insanity devolves upon the defendant, but it is not necessary that insanity be proven beyond a reasonable doubt." As authority for this contention appellant relies upon the case of Merritt v. The State, 39 Texas Crim. Rep., 70, and it must be admitted that this contention is not without some weight. In that case, as we gather from the record, the appellant Merritt was under the impression that deceased, with others, was engaged as part of a mob bent upon killing him or doing him serious injury and it was claimed that he killed deceased under this delusion. The charge as given in that case does not appear in the record but in the course of the opinion, it is stated: "No exception was reserved to the charge of the court on insanity, but in view of another trial we would observe that the charge of the court on this subject may be well enough as far as it goes, but it does not apply the law to the facts of the case. We think that the court should give the jury a charge on insanity as applicable to the facts proved. In this case appellant's proof tended to show that he was overwhelmed at the time of the homicide with an insane delusion that deceased was the leader of a mob that was seeking his life. If he was insane on that subject, and if, under that delusion, he was incapable of distinguishing the right and wrong of the particular act he was doing, and he believed that in slaying Brown he was preserving his own life from the mob, then he was not criminally responsible, and the jury should be instructed, if they believe the homicide occurred under such circumstances, to acquit him." This case has not, so far as we have observed, ever been followed or cited. We think the suggestions of the court are perhaps timely and appropriate for the reason that there the delusion had reference to and gathered itself around the supposed attitude of deceased and that he, in particular, was the leader of a mob seeking his life. The defense here raises the issue and contention of general insanity having the same relation to all persons. The opinion of the court in the case cited should, we think, be limited to the case then being considered. In the later case of Hurst v. State, 40 Texas Crim. Rep., 378, a charge very similar to that given in this case was approved, and it was there, as here, objected that it was insufficient in that it erects a single standard, to wit: that if appellant at the time he committed the act knew the differences between right and wrong thereof, he was sane; if he did not know it he was insane. It was urged that this charge was defective because this test was too circumscribed, in that it utterly ignored emotional insanity, or the inability of appellant to control his will-power, on account of his insanity. In that case appellant requested certain special instructions presenting this view. This court held that the refusal of these charges was not error and rests its decision on the principle

thus stated: "It occurs to us that if he was insane at all it was on account of the infirmity of his mind, which rendered him incapable of reasoning and knowing that the act he was then doing was wrong. This issue was fairly submitted to the jury, and we do not understand that any complaint is made in regard to its submission, but the charge is criticised only because the court did not give, in this connection, emotional insanity. As stated, we disagree with counsel in this contention." So, in this case, under the facts as introduced in evidence, if appellant was insane at all he was insane in respect to all persons. It is not shown or claimed that he had any special delusion in respect to Pierce, the deceased, but the whole evidence, taken together, and considered most favorably to appellant, the issue is, was he suffering from such defect of reason and impairment of the mind as to render him, in respect to the particular act done, insane, and as to leave him in such condition as not to know the right or wrong of the particular act then done. The charge of the court complained of is, as we believe, substantially in harmony with the decisions of this court as laid down in the cases of Sartin v. State, 103 S. W. Rep., 875; Nugent v. State, 80 S. W. Rep., 84; Kelley v. State, 101 S. W. Rep., 230, and Cannon v. State, 41 Texas Crim. Rep., 467.

4. Appellant complains of certain testimony, which will hereafter appear, adduced through Dr. B. M. Worsham, Superintendent of the Insane Asylum at Austin, who was introduced as a witness on the part of the State. This witness had shown great familiarity with paranoia, the form of disease or mental derangement under which appellant's witnesses claimed he was laboring and had testified at great length to the different stages through which one afflicted with this form of disease passed, and had in his testimony, made a strong showing based on his knowledge and experience of the improbability if not indeed the impossibility of the existence of the particular form of mental trouble named by the witnesses for appellant. In this connection the following question was propounded to him by counsel for the State: "Suppose that a person has paranoia, does he admit that he has it, or does he dispute that he has it? Suppose that a man would submit to being called insane on a trial in court, and never disputed it, what do the books say about that? Will he denounce the witnesses who testify in his presence that he is insane, at the time they testify to such fact?" To this question counsel for appellant interposed this objection: "Because it is an effort on the part of the State to use the appearance and conduct of the defendant in the courtroom, against him when he was not placed on the witness stand." This objection was by the court overruled and the witness testified as follows: "If a defendant is on trial, who is a paranoiac, and his insanity is plead and the witness testify in his presence that he is insane, he will reject and denounce them, in every instance, that I have ever known. He will

denounce them in the courtroom and elsewhere, even though he is on trial for his life. I have seen that personally." It is urged by counsel for the State that we should not consider this assignment for the reason that while excepted to at the time it was offered, it was not brought forward and urged as a ground in appellant's motion for a new trial. The motion does not raise the same point in respect to similar testimony of Dr. Parsons, but that there is no bill of exceptions in the record in respect to his assignment of error as to Dr. Parson's testimony; and that by failing to urge the exception as to Dr. Worsham in his motion for new trial, appellant has entirely waived that point. We think that having duly saved the point by bill of exceptions and it being a matter touching the action of the court, that it was not required that the same matter should again be urged in the motion for a new trial to make its review by this court possible, but that we ought to, and indeed must, pass on the question. It is urged again that the assignment should not be sustained for the reason that Dr. Worsham was not asked nor did any witness say that appellant failed to dispute his insanity, nor that he did or did not denounce the witnesses that testified that he was insane, and that the answer in question was merely an answer to a hypothetical question, and that before appellant could receive any benefit on this point it was his duty to explain the proceedings in a bill of exceptions, and show that he was injured thereby. There is much force in the State's position in respect to this matter and we are not sure but that we would be well justified in dismissing the assignment for the reason urged by the State. We have, however, considered the question and treated it not as an abstract one merely, but on the contrary as one that must have been understood by the jury and would have been understood by them as referring to the fact that the appellant, then present, and, through his counsel interposing the plea of insanity, was remaining and had remained silent in opposition to the uniform practice of paranoiacs time out of mind. The position maintained by appellant was in effect decisively ruled adversely to him in the case of Burt v. State, 38 Texas Crim. Rep., 397. In that case Dr. Davis was placed on the stand as a witness for the State and was permitted to testify that the defendant was simulating, that is, playing a part and not acting naturally. This testimony was held not inadmissible. Again, in that case Dr. Wooten was permitted to testify that while Burt was in jail he had gone to the jail, had taken the dimensions of his skull, and while there examined the defendant, talked to him, looked at him and observed him. This was held not to be error. Again, in that case Jack Hughes was placed on the stand for the State, by whom it was shown that he had noticed the fact that defendant had struck his head against the window frame the day before as he passed through the window, and that it was the only time defendant had done so in the many times

he had passed through said window during the trial. This was held not to be error. Summarizing on the question generally the court uses the following language: "We are not informed of any case holding that because a prisonrer is in jail, unwarned, therefore his conduct can not be observed, so that the expert can give an opinion as to his sanity. It would be a remarkable case, indeed, in which the accused, if insane, would simulate sanity. We can not comprehend how the fact that he was in jail could affect his conduct in this particular in any manner, and therefore the ruling of the court in regard to the testimony of Dr. M. M. Smith was correct. See Adams v. State, 34 Texas Crim. Rep., 470. See also Cannon v. State, 41 Texas Crim. Rep., 467. Again, as we have seen, "The conduct and acts of defendant while in jail may be given in evidence, as a basis for an opinion by a nonexpert as to defendant's sanity, though defendant was not warned that his acts and conduct would be used as evidence against him, as they are not a confession." Adams v. State, 31 S. W. Rep., 372. The admission of this testimony could in no proper sense be held to be a reference to the failure of the defendant to testify, but was merely the expression of an opinion by the expert, based on the testimony developed at a hearing and having reference to the conduct, appearance and demeanor of the defendant then present.

5. On the trial, on redirect examination counsel for the State propounded to Dr. Worsham a question in respect to what had passed between himself and counsel in respect to his attendance as a witness for the State herein. In response thereto Dr. Worsham testified as follows: "Mr. Morris wrote me that he would not ask me to come for only the compensation allowed by the State as witness fees, because it would cost me more than that to come here. He wanted to know what I would charge to come here, and I answered him and named the fee, which he accepted, and had me subpoenaed. He told me that he wanted me to come to Palestine and pass on the sanity of this man, and if he was insane to say so, and he would immediately stop the prosecution, and the district attorney also joined in this agreement or statement." The bill of exceptions in respect to this matter recites that the defendant at the time said answer was given objected to the same for the following reasons: "Because the same was beyond the power of the witness and the State's counsel and prejudicial to the rights of the defendant." The bill is allowed with the explanation of the court to the effect in substance that on cross-examination appellant's counsel went into the matter of Dr. Worsham's attendance at court and had him testify that the amount of such compensation was $150, agreed to be paid by the prosecution. This testimony was offered in redirect examination to explain the position of the witness, Dr. Worsham, and to give all the correspondence in respect to the compensation and other matters relating to his contract and testimony,

which matter had been gone into by defendant. The State objects to the consideration of this bill for the reason that it is too general, and that if objectionable at all, it was on the ground of hearsay, and that no such objection was made. It is also claimed that the testimony is admissible over any objection for the reason that defendant on cross-examination went into the matter of the contract between Dr. Worsham and State's counsel and showed that he was to receive a fee of $150, and that the answer complained of was merely stating the rest of the contract or correspondence between Dr. Worsham and the prosecuting attorney, and that as stated in the court's qualification to said bill, defendant's counsel went into the matter of Dr. Worsham's attendance in court and had him testify about the amount of compensation, which was $150, and that on redirect examination he gave the balance of the conversation and matters relating to his contract and testimony. The State claims that having gone into the contract and having introduced part of the correspondence themselves, that it was entitled to all the correspondence on the same subject and this was all that was introduced. The bill of exceptions is very general and can not be considered unless it is included under the general proposition that the testimony was prejudicial to the rights of the defendant. That a portion of the testimony was admissible, we think, there is no sort of doubt. That it was competent for the witness to testify, as he had done, that he had not sought to be a witness; that the matter of compensation came not as a suggestion from him, but from counsel for the State on the ground of the great expense to him of attending as a witness; that his compensation was unconditional and was without reference to whether his testimony should be favorable or unfavorable to the State, can not be doubted for a moment. That it was proper or competent to prove the accompanying statement of counsel for the prosecution that if he testified that appellant was insane he would dismiss the prosecution, we may seriously doubt. But the objection interposed went to the whole testimony, and the rule seems to be well settled that where an objection, such as this, involving a number of statements given, a part of which are admissible and some portions of which may be inadmissible, and there is nothing in the objection to directly challenge or single out the objectionable testimony, that such a bill ought not in fairness to be considered. This proceeds upon the principle that it is not fair to a trial court, for that it must be assumed that if the objectionable testimony were directly challenged by pointing it out and singling it out for decision, that same would be sustained, and where counsel content themselves in a case where much of the answers and testimony is admissible and only some features of it inadmissible to make a general objection, that this is not good practice or fair to the trial court. It proceeds also upon the principle that such practice would burden this court with many appeals and the consideration of many

questions, when if they had been presented fully and fairly to the trial court, such objection would be sustained and it would be unnecessary for us to review on appeal these matters. It is, as we think, undoubtedly true that in view of the matters complained of by appellant to the effect that Dr. Worsham was to receive $150, that it was not only admissible but important to the State to show how he came to be a witness, and that, as we have no doubt is the case, that his fee or compensation was not dependent upon the testimony to be given by him, but was a sum fixed without reference to the character of testimony he gave. That portion of the testimony carrying the statement of Mr. Morris that he would immediately stop the prosecution, and the district attorney also joining in this agreement or statement, if the witness would testify that appellant was insane, we think, is subject to some criticism. But it was a mere expression after all of the high regard of counsel for the proficiency and skill of the witness, and such a one as, if made in argument, would not have been reversible error; nor can we believe that the inclusion of such a statement in the testimony is of such gravity as would warrant us in reversing a case where the record is otherwise free from error.

6. Again, objection was made to the action of the court in overruling the challenge of appellant to the juror Gore, and the action of the court in respect to this matter is urged as a serious invasion of his rights and as cause for reversal. On preliminary examination by counsel for the State this witness had stated that he had no such opinion with reference to the guilt or innocence of the defendant as would influence his action in finding a verdict. On cross-examination he stated, in substance, in reply to questions by counsel for appellant that he had from his conversations with his neighbors and what he had read formed an opinion as to appellant's guilt or innocence; that he had this opinion in his mind and that it would require evidence to remove it. He also stated that he was a man of strong convictions and that when his mind was once made up it was not changed unless there was evidence introduced to change the opinion then formed. Thereupon the court interrogated the witness, which appears by the following: "The court: You understand that the law says that the defendant himself must prove the defense of insanity by a preponderance of the evidence. Not beyond a reasonable doubt? A. Yes, sir; I understand that. Q. Will you require more proof than what the law requires or what the court will charge you? A. No, sir; I would not require any more than the law would require. Q. (by Mr. Campbell for the defendant) You have some little prejudice against insanity as a defense? A. No, sir; not that I know. Q. Would that proof have to be conclusive to your mind? A. It would have to be sufficient to establish the fact that he was insane. It would have to establish the fact that he was insane at the time of the killing. Q. Wouldn't that

proof have to be convincing? Would that proof to establish his insanity have to be convincing? A. Yes, sir. Q. I believe you said you would give that defense a fair and impartial consideration in making up your verdict in this case, based on the evidence. A. Yes, sir." Whereupon he was further interrogated by the court as follows: "Q. Do you mean by convincing that you would require any more than the law would require as charged by the court? A. No, sir; just enough to establish the fact. Q. You think you can try it according to the law and the evidence? A. Yes, sir. Q. As to whether or not you have formed any opinion as to his guilt, how did you get that opinion? Just hearsay? A. Just from what I have heard; if what I have heard were the facts, he is guilty. Q. He is guilty, provided it does not appear otherwise that he had his self-defense? A. Or that he was insane, or something of the kind. Q. Do you feel able to discard everything you have heard, and try this case strictly according to the law and the evidence? A. Yes, sir." As is shown above, substantially the only issuable fact in the case was defendant's plea of insanity. There was no issue made or denial interposed that he killed the deceased, nor was there any semblance of justification, under the law of self-defense or otherwise. That this juror had formed no opinion upon the only issuable fact in the case was unquestioned. He states, in terms, in answer to the question, "Have you any prejudice against the plea of insanity in a murder case?" that he had not. And also stated that if he was taken in the case as a juror he would give the defendant the same fair and impartial hearing on that issue as he would on any other. If the trial had involved the issue of whether or not appellant was justified in killing deceased, then a more serious question would be presented. But under the authorities, in view of the entire examination, it is believed that even if this were the issue, he was not disqualified from sitting as a juror in the case. In Adams v. State, 35 Texas Crim. Rep., 295, the court say: "The answers of said jurors, in connection with the qualification of the court to the bill of exceptions, show that those of said jurors as had formed any opinion in the case had done so, not from having heard any witness state the facts, but from rumor and hearsay; and they further declare that notwithstanding any opinion then entertained as to the guilt or innocence of appellant, they could give the appellant a fair and impartial trial on the evidence in the case." Keaton v. State, 41 Texas Crim. Rep., 621; Suit v. State, 30 Texas Crim. Rep., 319; Post v. State, 10 Texas Crim. App., 591; Johnson v. State, 21 Texas Crim. App., 368; Kennedy v. State, 19 Texas Crim. App., 629. In the case of Wilkerson v. State, 57 S. W. Rep., 956, the court uses this language: "There is no evidence that any of the jurors talked to any of the witnesses, or heard any of the witnesses testify on the previous trial. Their opinion

seems to have been made up of rumor, hearsay, statements, or reports other than the testimony of the witnesses. This conclusion we understand to be supported by the following authorities: Suit v. State (Texas Crim. App.), 17 S. W. Rep., 458; Mayes v. Same (Texas Crim. App.), 24 S. W. Rep., 421; Adams v. Same (Texas Crim. App.), 33 S. W. Rep., 355; Trotter v. Same (Texas Crim. App.), 36 S. W. Rep., 279; Hamlin v. Same (Texas Crim. App.), 47 S. W. Rep., 658; Shannon v. Same, 34 Texas Crim. Rep., 5, 28 S. W. Rep., 540." It is not shown that this juror had formed any opinion whatever as to defendant's right to plead insanity. In fact, his answer to the court showed that if he should plead and prove insanity, he would acquit him, and that under such plea he would treat him fairly, as he had no prejudice against that defense. It must also be remembered that at the time the juror received his information and impression with respect to the killing, that so far as is shown by the record, the matter of appellant's insanity had not been discussed in his section of the county so far as he was concerned; nobody had broached it, and it was not likely that this juror, a total stranger to all the parties, would have any information with respect to this issue or any occasion to have been unfair in respect thereto.

7. Again, complaint is made of the admission of testimony introduced by the State to the effect in substance that in their judgment appellant was of sound mind, for the reason that the facts stated by them and the matters as testified to, are not of such nature as would justify the court in receiving the evidence as to their opinion or conclusion in respect to his insanity. We have carefully examined the record in respect to all these matters and believe that no error was committed by the court in respect to these several bills. The objections at best go mainly to the weight to be given.

8. A particular objection of this sort is urged against the testimony of P. E. Smith, who it seems was jailor in Anderson County, and who had had appellant in custody since the 31st day of January, 1908. This witness testified that he often went back and talked to the prisoners; that he fed them twice a day; that appellant was clean shaven when he first came to the jail; that his appetite has been very good since he has been in jail; that his rest had been tolerably good; that if he had ever failed to eat his meals that he had not observed it; that he had frequently talked about farming and about his strawberries, and on one occasion about shaving, and that he stated he might need his whiskers; that he asked him once if he did not want to go out and get shaved; that he replied: "No; I might need these whiskers." It was held in the case of Adams v. State, 31 S. W. Rep., 372, that the conduct and acts of defendant while in jail may be given in evidence, as a basis for an opinion by a nonexpert as to defendant's sanity, though defendant was not

warned that his acts and conduct would be used as evidence against him, as they are not a confession. However, it is stated in that case that "no specific act or declaration of the defendant was adduced in evidence, nor were the contents of any letter alleged to have been written by defendant shown in evidence." We are no prepared to say that we understand just the significance of the testimony as to the declaration of appellant that he did not want to be shaved and that he might need his whiskers. There is considerable testimony in the record that before the homicide appellant always went clean shaven, and we gather from the statement of facts that since the homicide he had let his whiskers grow out. We can not see that if any of this testimony could be held to be, under any circumstances, inadmissible, it is of such gravity or importance as could possibly have injured appellant, nor indeed do we believe that it was subject to serious objection.

9. Again complaint is made that the court erred in charging the jury on the law of murder in the second degree, and in submitting to the jury the issue of manslaughter on the ground, in substance, that the evidence did not raise either of these issues, and that the effect of including them in the charge was to confuse and possibly mislead the jury. It is conceded and stated in the brief by appellant that ordinarily this would not be error, but in view of the fact that there is no pretense that the killing was justified, in self-defense or for any other reason, and that the sole defense is insanity that the killing, if appellant was legally responsible was unquestionably one of murder in the first degree. We do not think that the contention of appellant that he was prejudiced by the submission of these issues, or that the jury were thereby confused, can, in the face of this record, and the finding of the jury, be sustained. But for one or two circumstances included in the record, we would have no hesitancy in holding that murder in the second degree was not in the case. It will be remembered, as noticed above, that one witness testified that only about a half hour before the homicide appellant spoke to him in a state of great excitement with reference to what he believed was an invasion of his rights and an unlawful sequestration of his property by someone, probably the deceased, and the witness accompanying him. This raises, to our minds, the issue of murder in the second degree, and we think it safer for the court to have pursued the policy, as was done in this case, and to charge on this degree of unlawful homicide. We do not think the court was required to charge on manslaughter, but the submission of the issue was favorable to appellant and he can not complain.

10. The record in this case is a very voluminous one, and many questions are urged on us with great vigor and earnestness as grounds for reversal of the judgment of conviction. That appellant is a singular and strange man is not to be denied; that he may be insane in the light of this record is possible. That issue, however,

was submitted to the triers of all matters of fact. Under a charge, as we believe, not subject to substantial criticism, the jury have affirmed their solemn conviction that at the time he shot and killed the deceased he was laboring under no insanity or such infirmity of mind as would in law excuse him from his horrible act. Otherwise than insanity there is no possible defense in the case. Whatever view, as an original question, we might have in respect to the matters, a due observance of the well settled law, that where there is a conflict in the evidence, the finding of the jury should not be disturbed, we would be utterly without excuse to place any impression or conviction of our own against that of the twelve, who being sworn to try the case, heard the evidence, saw the witnesses and had such opportunities as we can not, in the nature of things, have for reaching a just verdict. Again, in such cases a high regard should be had for the action of the trial court. The law charges him, in the first instance, with the responsibility of setting aside verdicts of juries where the evidence is insufficient to sustain their action. The verdict comes to us with the sanction of the trial court, and we can not believe that we should in the light of this record, set aside and overturn the verdict of the jury having the sanction and approval of the trial court.

We have, therefore, as we believe, but one duty to perform, and that is to decree, as we do, that the judgment be in all things affirmed.

*Affirmed.*

[Rehearing denied March 20, 1909.—Reporter.]