the saloon; nor was deceased making any attempt to execute any threat. So there was no error in this omission." Armstrong v. State, 50 Tex. Cr. R. 27, 96 S. W. 15; Dobbs v. State, 54 Tex. Cr. R. 552, 113 S. W. 923; Davis v. State, 52 Tex. Cr. R. 149, 106 S. W. 144.

The court did not err in refusing appellant's fourth special charge. The facts of this case did not call for it and it is not the law.

[7] Appellant's only other complaint is that the evidence is insufficient to sustain the verdict. The evidence is not only amply sufficient to sustain the verdict, but the verdict finding him guilty of murder in the second degree is a just and righteous one.

The judgment is affirmed.

---

STUBBS v. STATE.

(Court of Criminal Appeals of Texas. Oct. 15, 1913.)

1. CRIMINAL LAW (§§ 1092, 1099*) — STATEMENTS OF FACT—TIME OF FILING.
   Where the term of the county court at which accused was convicted adjourned May 3d, a statement of facts and bills of exception, not approved and filed until July 2d, cannot be considered, coming more than 20 days after adjournment.
   [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2803, 2829, 2834–2861, 2866–2880, 2919; Dec. Dig. §§ 1092, 1099.*]

2. CRIMINAL LAW (§ 829*)—TRIAL—INSTRUCTIONS.
   The refusal of a special request, covered by the charges given, is not error.
   [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2011; Dec. Dig. § 829.*]

3. CRIMINAL LAW (§ 1088*)—BILL OF EXCEPTIONS—MOTION FOR NEW TRIAL.
   That the bill of exceptions embraces the motion for new trial does not add anything to the motion, or give accused any additional grounds for review.
   [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2676, 2746–2751, 2757, 2766, 2782–2802, 2899; Dec. Dig. § 1088.*]

4. CRIMINAL LAW (§ 1159*) — APPEAL — VERDICT—EVIDENCE—SUFFICIENCY.
   A verdict by the jury on conflicting evidence will not be disturbed on appeal.
   [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3074–3083; Dec. Dig. § 1159.*]

5. CRIMINAL LAW (§ 824*)—TRIAL—INSTRUCTIONS.
   In a prosecution for misdemeanor, special charges must be requested, if any special issue is desired to be presented.
   [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1996–2004; Dec. Dig. § 824.*]

6. LARCENY (§ 78*)—TRIAL—INSTRUCTIONS—APPLICABILITY TO EVIDENCE.
   In a prosecution for misdemeanor theft, no charge on the voluntary return of stolen property is necessary, where the evidence showed that the property was not returned until after prosecution was begun.
   [Ed. Note.—For other cases, see Larceny, Cent. Dig. § 182; Dec. Dig. § 78.*]

Appeal from Limestone County Court; A. M. Blackmon, Judge.

Bill Stubbs was convicted of theft, and he appeals. Affirmed.

C. E. Lane, Asst. Atty. Gen., for the State.

HARPER, J. Appellant was prosecuted and convicted of misdemeanor theft, and his punishment assessed at one hour in jail and a fine of $5.

[1–3] The term of court at which appellant was tried adjourned on May 3, 1913. The statement of facts and bills of exception were not approved and filed until June 2, 1913, more than 20 days subsequent to the adjournment of court for the term; consequently, the motion to strike them from the record must be sustained. But, were we to consider them, they would not avail appellant. One of the bills is to the refusal of the court to give a special charge requested. This charge was fully covered by the court's main charge. The other bill only embraces the motion for a new trial. This adds no strength to the motion for a new trial.

[4] The first two grounds of the motion complain of the insufficiency of the testimony. The testimony is amply sufficient to support the verdict. It is true the testimony of the defendant would show that the buggy robe was taken by a mistake; but this issue was fully presented to the jury, and they found adversely to that contention.

[5, 6] There was no special charge requested in regard to a voluntary return of the stolen property, and in a misdemeanor case a charge must be requested, if it is desired that any special issue be presented. However, if a charge had been presented, the evidence does not raise that issue, as the prosecution had been begun before any steps had been taken looking to the return of the property.

The judgment is affirmed.

---

PINKERTON v. STATE.

(Court of Criminal Appeals of Texas. June 27, 1913. Rehearing Denied Oct. 22, 1913.)

1. BURGLARY (§ 41*)—SUFFICIENCY OF EVIDENCE.
   Evidence held to sustain a conviction for burglary.
   [Ed. Note.—For other cases, see Burglary, Cent. Dig. §§ 94–103, 109; Dec. Dig. § 41.*]

2. CRIMINAL LAW (§ 511*)—EVIDENCE—CORROBORATION OF ACCOMPLICE—SUFFICIENCY.
   Evidence, in a prosecution for burglary held to sufficiently corroborate the testimony of an accomplice.
   [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1128–1137; Dec. Dig. § 511.*]

3. CRIMINAL LAW (§ 508*)—EVIDENCE—TESTIMONY OF ACCOMPLICE.
   A witness who had testified in a prosecution for burglarizing a store that he and accused hid knives taken therefrom at a certain

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

place the day after the burglary was properly allowed to testify that just after he was before the grand jury he went to such place, and that the knives were gone.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1099–1123; Dec. Dig. § 508.*]

**4. BURGLARY (§ 35*)—ADMISSION OF EVIDENCE —TRACKS.**

In a prosecution for burglarizing a store in the night, evidence that witness found the tracks of a buggy, horse, and men at the store and traced the tracks to a lot at the place in which accused lived, was admissible where such tracks were identified as being made by accused and those with him.

[Ed. Note.—For other cases, see Burglary, Cent. Dig. § 83; Dec. Dig. § 35.*]

**5. CRIMINAL LAW (§ 1091*)—APPEAL—BILL OF EXCEPTIONS.**

A bill of exceptions to the admission of evidence will not be considered if some of the evidence is admissible and the objectionable part is not expressly pointed out.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2803, 2815, 2816, 2818, 2819, 2823, 2824, 2828–2833, 2843, 2931–2933, 2943; Dec. Dig. § 1091.*]

**6. BURGLARY (§ 34*)—ADMISSION OF EVIDENCE.**

In a prosecution for burglary of a store, evidence by the owner that he thereafter received a box of knives of the same brand that he handled was admissible, where accused's accomplice had testified that the knives which accused stole and he and accused buried the day after the burglary were afterward removed by some one, and another witness testified that the knives returned to the owner were found under a schoolhouse near the burglarized store.

[Ed. Note.—For other cases, see Burglary, Cent. Dig. § 85; Dec. Dig. § 34.*]

**7. CRIMINAL LAW (§ 1186*)—APPEAL—HARMLESS ERROR.**

In a prosecution for burglarizing a store, the court instructed that if accused, either alone, or acting with another so as to constitute him a principal, unlawfully burglarized the store with intent to steal, the jury should find him guilty. *Held,* that the instruction was not prejudicial, even if erroneous, merely because there was no evidence that accused kept watch at the store, the evidence being that his accomplice did so, and because there was no evidence that accused burglarized the store alone; Code Cr. Proc. 1911, art. 743, forbidding reversals because of defects, if it was not calculated to injure accused's rights.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3215–3219, 3221, 3230; Dec. Dig. § 1186.*]

**8. CRIMINAL LAW (§ 770*)—ISSUES—EVIDENCE.**

The fact that one who with two others, slept in a schoolhouse near the burglarized store on the night of the burglary had since moved to Oklahoma, and the sheriff could not find him in the county, and that knives from the burglarized store were found under the schoolhouse, did not authorize the submission of the issue that such person committed the burglary, where the persons sleeping at the schoolhouse with him testified that he was in the schoolhouse all night.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1806; Dec. Dig. § 770.*]

Appeal from District Court, Erath County; W. J. Oxford, Judge.

Ed. Pinkerton was convicted of burglary, and appeals. Affirmed.

Chandler & Pannill, of Stephenville, for appellant. C. E. Lane, Asst. Atty. Gen., for the State.

PRENDERGAST, J. From a conviction for burglary with the lowest penalty prescribed by law fixed, appellant prosecutes this appeal.

Mr. A. A. Kerr was a merchant in the small country town of Ex Ray in said county, and handled general merchandise, including most everything used in a country store. It included a stock of pocketknives and canned oysters and salmon. On Saturday night April 27, 1912, his store was burglarized, and two boxes of pocketknives—one full, the other not full—and some salmon or oysters, or both, were stolen therefrom. On that Saturday night there was a dance some few miles north from Ex Ray, and, among others who attended it, were five young men—appellant, Ed. Glasgow, Dick Gordon, Sid Davidson, and John Secreast. The dance ended some time between 12 o'clock midnight and 2 o'clock a. m. Said Gordon, Davidson, and Secreast left the dance, going to their homes, traveling in a single horse top buggy. Glasgow and appellant left the dance riding one horse, one behind the other, following said buggy; the horse they were riding belonged to appellant's father. When they got in about a mile from Kerr's store a rain came up. The parties in the buggy had the top up, the side curtains on, and the storm apron in front up so as to protect them from the rain. There was considerable wind with the rain. When the rain began they had to turn the buggy around from the way they were going so as to prevent the wind from blowing the rain on them. Appellant and Glasgow reached them just at this time, got off the horse, and got in the buggy with the other three to keep out of the rain; they remained in the buggy some 20 or 30 minutes until the heavy part of the rain was over. They then got out of the buggy, mounted the horse, as before, and started on home. The homes of all these parties were beyond Ex Ray, and they had to pass by Kerr's store in order to reach their respective homes. The place where the dance was, was off of the main road, and all these parties reached the main road, running about north and south, about one mile from Ex Ray.

Ed. Glasgow testified: That directly after he and appellant started from the dance home, appellant said to him they would not lose anything by riding in the rain. He asked him "Why?" Appellant replied, "We will rob them damn stores at Ex Ray." He told appellant he thought it best not to do so. They said nothing to the parties in the buggy about this. That shortly before he and appellant reached said store appellant asked him if "we were going to break into the store," and he again replied he thought it

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

best not to do so. They then rode on up in front of the store and stopped; the store fronted east; it had a gallery clear across the front. In the center of the store in front was the door, and a window on either side. That when they stopped the horse in front of the store appellant got down, stepped up on the gallery, and he got down, got up on the gallery, and held the horse at the south end of the gallery. That appellant told him to hold the horse and watch, and said he was going in the store. Appellant then went to the north window, and went to work at it to get in the store. That he removed one of the panes of glass from the window, reached in at that, and removed the stick from over the window which prevented the window from being raised. Appellant then went in the store and remained some little time, Glasgow remaining out, holding the horse and watching. That just before appellant went in the store the other three parties passed, going south in the road in the buggy, and did not stop. Neither of them got out of the buggy. This road was a public road in about the center of about a 75 or 80 foot street in front of said store, and the buggy passed no nearer the store than the road. That just after these parties passed in the buggy appellant succeeded in effecting an entrance into the store, and while he did not remain long, he was in there several minutes. He came back out of the store through this window, approached the witness, and told him, "Let's go." They both got on the horse again, went up the road some 400 or 500 yards from the store to a church building. That they there stopped the horse, tied him in front of the church, and went into the church. Appellant there showed him four cans of oysters, which they cut and ate in the church. That appellant then stated to the witness that he had also gotten some pocketknives out of the store. That after remaining in the church 10 or 15 minutes they went out, unhitched, and both walked and led the horse from there to appellant's father's gin lot at his father's residence. The distance from the church to appellant's father's house, some of the witnesses say, is about 100 yards; said Glasgow said about 400 yards from the church. That when they got through the gin lot gate, they unsaddled and turned the horse loose, then went into appellant's father's house. Appellant, procuring a light, went into his room, showed the witness the pocketknives which he had gotten out of the store and they then went to bed and slept till late the next morning, when they were awakened. That after they got up next morning, at appellant's instance, they took the two said boxes of pocketknives, went some 200 or 300 yards distant from appellant's father's house, dug a hole in the ground on a knoll by a ravine, and buried the two boxes of knives. That appellant stated that if they searched his house they would not find the knives. That nothing was said at that time about dividing the knives between them. That then they went back to appellant's father's house, where he remained a few minutes, and, without getting any breakfast there, he started to his home some few miles distant, walking. That in thus going to his home he passed some houses, and perhaps met some parties, and among others, he thinks he saw Mr. Shelby. That the next day, Sunday, at Sunday school he spoke to appellant about the matter of going into the said store, and appellant said to him that they "had been tracking us and were sure to get us," and told the witness he would have to stand pat on it. The witness replied he guessed he would. About a month later, he met appellant at another dance, and appellant again asked him if he was going to stay with him, and he replied he guessed he would. Again, on Wednesday or Thursday night before the witness went before the grand jury, appellant again asked him if he was going to stand pat, and he made the same reply. That appellant said he would do that towards the witness. He further testified: "After I was before the grand jury in this matter, I went with Mr. George Shelby to look for the knives and the place where they had been buried on the Sunday morning after the burglary, going there directly from the grand jury room. We did not find the knives, but did find the hole where they had been buried. We had no trouble in locating the place where the knives had been buried"—and he then showed the place to Mr. Shelby.

Said Gordon and Secreast both testified for the state, corroborating said Glasgow as to their being at said dance that night and leaving there, the manner and direction in which they traveled, about the rain coming up, and stopping and turning the buggy, and said Glasgow and appellant reaching them on said horse, getting off of the horse, into the buggy with them, and remaining until after the heavy shower of rain was over; that appellant and Glasgow then got out of the buggy, remounted the horse and preceded them towards Ex Ray; that they traveled down the road in the buggy, passing in front of said store in the road; that they did not stop the buggy there; that neither of the three got out, but that they went on some 200 or 300 yards past the store, leaving the road to one side and went to a Mr. Pinkerton's—not appellant or appellant's father—borrowed from him a wagon sheet, went from there a short distance to a schoolhouse, hitched their horse and buggy, went into the schoolhouse with the wagon sheet, and all three went to bed, covering with the wagon sheet, and remained and slept until the next morning; that neither of them left the schoolhouse after reaching it until the next morning, and they were all three there when they went to bed and when they awoke and got up; that they then got their buggy and proceeded the next morning to their respec-

tive homes; that neither of the three in the buggy entered the store of Mr. Kerr on that night; that they did not stop on the road in going through the town; neither did they see anybody about the store as they passed through town. Gordon testified: "I do not even remember to have seen the store or to have looked that way in passing it. * * * We all three remained at the scholhouse the balance of the night, and did not leave the schoolhouse, and did not go from there to the Kerr store, but went from the school-house home." Secreast testified: "I remember to have seen the bulk of the Kerr store as we passed by, but did not pay any particular attention to it, and did not see anybody at the store when we passed. * * * After we got to the schoolhouse all three of us went to bed in the wagon sheet, and stayed there the balance of the night."

Said Kerr testified in addition to what is shown above. He corroborated Glasgow fully as to how and where an entrance was effected in his storehouse that night. That he went to his store the next morning, Sunday morning, and the window pane being out of a window and the stick removed first attracted his attention. That he then went into his store and looked around and missed some cans of salmon. "I could not state whether it was salmon or oysters, but I know there was some salmon gone." That he carried canned oysters in his stock generally, but did not remember so particularly about having oysters at that time. That he found two boxes of pocketknives missing, one a full box, and the other with at least three or four knives in it. Kerr further testified: "On Sunday morning I saw the tracks of a horse there at the front gallery of the porch, and from the looks of the tracks the horse had probably stood there for some little time, and there were the same tracks leading from this south end of the gallery on up the road. I examined the tracks there at the store porch, and then followed them on up the road to the churchhouse, and then on by the churchhouse to the gate that goes into Mr. Pinkerton's gin lot, where I left them, and did not examine them any further. Dr. Mc-Donald was with me at the time I was making this examination of the tracks. There was only the one track that we followed from the south end of the gallery on up to the churchhouse, and from there on to the gin lot gate. There were no other horse tracks along the way that I noticed. I also saw the tracks of a buggy along the road in front of the store. I could not state whether the buggy had stopped or not, but it seemed to have passed on down the road. I followed the buggy tracks on up to the schoolhouse, and saw there that it had stopped. I did not find any man's tracks about my premises on this Sunday morning, or if there were any there I did not notice them. I could follow the tracks of this horse all right, from the gallery on up to the church, and then to the

gin lot gate, but I did not notice anything peculiar about the track, or any distinguishing marks about it. I just noticed that it was a shod horse. Since the date of this burglary I have received a box of knives, handed to me by Ollie McInrow, or brought to me by him. They were the Rex brand of knives, and the same kind of knife that I handled at that time. I do not know where McInrow got the knives, except from a hearsay statement. The box containing the knives had the cost mark removed from it when they were returned to me. I had my cost and selling mark on the boxes the knives were kept in at the time in question, and the knives I received from the McInrow boy were in the same kind of a box, and were knives of the same brand as the ones I carried in stock, and the box returned to me was also marked with the Rex label or brand." He further testified that he did not attempt to track the horse any further than to appellant's father's gin lot gate; that when he got there he turned back towards the schoolhouse, and there saw the buggy tracks that had stopped there, and where a horse had been standing, as though hitched to a tree; that the Pinkerton gin lot was about 100 yards further on from the churchhouse; that said box of knives returned to him by the McInrow boy were given to him just a few days before this trial. "When I got it, the box seemed to be a little yellowed like it had been carried for some time, and on the top of the box where I always put my cost mark had been scratched away, or else had been in water and decayed off, and the general appearance of the box was dirty." On cross-examination by appellant on this point, he testified that when the McInrow boy brought the box of pocketknives to him he told him that they had been found under the schoolhouse. "The cost mark had been written on the box itself, and had either been scratched away or had been effaced in some way."

Dr. McDonald substantially testified the same thing about the horse tracks, men's tracks, and buggy tracks, and where he and said Kerr tracked them, the same as Kerr had testified.

Burling Dorris testified: That he was a blacksmith, lived about 400 yards north of said Kerr's store, and on the evening after the burglary had occurred that night he went north on the road about a mile to his pasture, and that he tracked the buggy and the said other horse back north some distance, and saw a place where two horses seemed to have stopped for a time. He did not follow the buggy and said other horse's tracks beyond that. That he also saw said horse's and men's tracks at said Kerr's store. That the tracks he saw of the horse were of a horse shod slick with a No. 0 shoe. That about two weeks before this he had shod a horse with this character and size of shoe for Mr. Pinkerton (appellant's father). That he had

before that shod a good many other horses around in the country with the same character of shoe, and that the tracks he saw about Kerr's store were made with a 0 shoe, or a shoe without the cork. On cross-examination he testified that the track of the horse pulling the buggy was a different track from the other horse track; that the horse pulling the buggy was shod with a cork shoe.

Will King testified substantially as Kerr and McDonald had testified about the horse tracks at Kêrr's store, and therefrom towards and up to the church, but that he followed the tracks no further; that he also tracked the buggy to the schoolhouse, substantially as the others had testified.

Andrew Shelby testified that the Sunday morning after the burglary the night before he saw said witness Glasgow in the road below his (Shelby's) house, and that Glasgow was coming from the direction of Ex Ray and a little west of the home of Mr. Pinkerton, appellant's father, and about one-half mile from Pinkerton's house.

George M. Shelby testified that he lived near Ex Ray, about one-half mile from Kerr's store, and remembered the circumstances of the burglary of Kerr's store; that he had known Ed. Glasgow about a year and a half; that during the last term of the lower court he went with Ed. Glasgow to Ex Ray, and from there down on a branch with Glasgow near the home and east of said Pinkerton's about 200 or 300 yards from Pinkerton's house, "and I found a little hole in the ground in some little low brush. In going there we first struck a trail that led down to this branch and went on down to a second bottom, and on the right-hand side in a little bunch of bushes, and near an oak tree, was a small hole in the ground near the root of the tree. Ed. Glasgow found the hole and showed it to me." On cross-examination he testified he did not discover the hole until the boy, Ed. Glasgow, showed it to him, and that they had been there only a short time when he did. On re-examination by the state he testified that the hole was about 4 or 5 inches wide, about 2½ inches deep, and 6 or 7 inches long, or something like that. The hole appeared to have been made by some one, and was not a natural hole in the ground.

Ed. Glasgow, recalled by the state, testified that he had known appellant about a year and a half, never had any trouble at any time, and his feelings towards him now are as good as ever, and he liked him as well as he ever did.

[1, 2] This is a sufficient statement of the evidence to review the questions presented by appellant. The evidence is unquestionably sufficient to sustain the conviction, and the accomplice, Glasgow, is amply corroborated.

[3] Appellant has seven bills of exceptions to the introduction of testimony. One is to that part of the testimony of Glasgow substantially quoted above, wherein he tells about going from the court at Stephenville just after the time he was before the grand jury, to where he testified he and appellant had buried some knives, hunting for them, and what he said and did with Shelby thereabout.

Another bill is to the testimony of said George M. Shelby on the same subject. His grounds of objections to said testimony were that they were the acts and declarations of said Glasgow and Shelby in his absence, that Glasgow, the accomplice, could not corroborate himself thereby, and that said testimony was immaterial, irrelevant, and hearsay. The court, in qualifying the bill to said Shelby's testimony, stated: "With the explanation that Glasgow testified that he and defendant on the morning after the burglary hid the knives in that place; that he, the witness, left this neighborhood on the following day, and never was in it nor about where the knives were hid till he went to Stephenville or from the grand jury room, in company with George Shelby, a grand jury bailiff, back to said place; and the court thought it proper to let Shelby tell what discoveries he made at said place."

[4] Appellant's second, fourth, fifth, and sixth bills are to the introduction of the testimony by said Kerr, McDonald, King, and Dorris about the said tracks that they found and respectively testified about. The grounds of his objections are substantially that they merely describe the horse tracks, and did not connect appellant therewith, that the horse tracks were not identified as those of the horse ridden by him, and that the testimony was immaterial and irrelevant. To the bill objecting to Kerr's evidence, the court made this qualification: "That witness swore he followed the identical horse back from where the horse stood at the east gallery of his store, to the church and on the defendant's father's gin lot, and in the gate of said gin lot. That defendant lived with his father, and that the gin lot was connected with the residence lot of defendant's father, and in close proximity to said residence"— and he made the same qualification to the bill objecting to McDonald's evidence.

In our opinion all this testimony objected to by appellant was admissible, and the court did not err in admitting it.

As to the tracks of said horses, buggy, and men, the testimony of the witnesses was not as to comparison of tracks, but the testimony of said Glasgow, Gordon, and Secreast had particularly identified the buggy, horse, and men's tracks as the tracks made by the horses and Glasgow and appellant, by the positive testimony of these witnesses. This was not a case of circumstantial evidence, and that line of authorities about the comparison of tracks for the purpose of identification, when the case is wholly circumstantial, are inapplicable in this case. It is needless to cite the authorities showing the admissibility of this testimony, but see subdivision "D," sec. 1074, pp. 688, 689, White's Ann. C. C. P.

As to appellant's bills to the testimony of said Glasgow and George M. Shelby, above specified, appellant cites us to McKenzie v. State, 32 Tex. Cr. R. 568, 25 S. W. 426, 40 Am. St. Rep. 795, and several other cases, some quite recent, to the effect that if a conspiracy to commit a crime has been completed, the admission, statement, or confession of the accomplice are inadmissible against the accused when the accused is on trial. These cases announce a correct principle of law, but they are not applicable to this case. Here the testimony objected to was of the accomplice himself. He testified fully to the facts. The state was not attempting to prove by other and independent witnesses what the witness Glasgow himself had said to them, or confessed outside of the court, and not as a witness. Certainly, the positive testimony of Glasgow was admissible, and so was that of Shelby, objected to, under the circumstances of this case.

[5] Again, without question, a part of the testimony of each of these witnesses was admissible. Even if there had been some particular portion of it inadmissible, appellant made no specific objection to that, but objected to the whole. In Ortiz v. State, 151 S. W. 1057, this court said: "A bill of exceptions is too general for consideration if it includes a number of statements, some of which are clearly admissible, and there is nothing in the objection directly pointing out the supposed objectionable portions of the evidence," citing Branch's Crim. Law, § 47; Payton v. State, 35 Tex. Cr. R. 510, 34 S. W. 615; Tubb v. State, 55 Tex. Cr. R. 623, 117 S. W. 858; Cabral v. State, 57 Tex. Cr. R. 304, 122 S. W. 872.

[6] Appellant's other bill, No. 3, is to the testimony of said Kerr about the said pocketknives. His grounds of objections to this testimony were that it was too remote, and the knives were never shown to be in appellant's possession, and not identified as the stolen knives, and that it was irrelevant, hearsay, and prejudicial. The court, in allowing the bill, did so with this explanation: "That the witness also stated without objection that McInrow told him the knives were found under schoolhouse, and the Glasgow boy had theretofore testified to the absence of the knives from the place they were first hid." This testimony was admissible. Appellant's objections go more to the weight of the testimony than to its admissibility. The jury were entitled to the proof, and it was for them to weigh the evidence in connection with all the other facts and circumstances in the case, and they could give it such weight as to the identity of the knives, and that they were the stolen knives, and appellant's connection therewith, as they thought it entitled.

[7] The court in its charge gave a correct general charge, conceded to be so by appellant, as to who are principals under the stat-

ute. He next charged in submitting the case, in effect, that if the jury believed from the evidence beyond a reasonable doubt that the appellant, Ed. Pinkerton, in said state and county, on or about the time alleged in the indictment, either alone or acting under such circumstances with Ed. Glasgow as to constitute him a "principal," as that term is hereinbefore defined, did unlawfully and fraudulently, at night, by force, break and enter the said storehouse of Kerr with intent then and there on the part of him, said Pinkerton, fraudulently to take, steal, etc., corporeal personal property belonging to said Kerr, with the other necessary ingredients to be found, then to find him guilty, etc. Appellant's objections to these charges are that there was no evidence that appellant kept watch, etc., but the evidence was wholly that Glasgow kept watch, etc., and that there was no evidence that appellant *alone* burglarized said store, but that he did so, and that Glasgow aided, watched, etc. The charge may not be very happily worded, but it certainly is not so worded as to do appellant any injury whatever in this case. He was given the lowest penalty prescribed by law. Under such circumstances, even if it should be conceded that there was some error of verbiage in the charge, under article 743, C. C P., this court is forbidden to reverse the judgment on that account, because the error appearing, if so, was not calculated to injure the rights of appellant.

[8] The court did not err in not submitting whether or not said Davidson, or some other person than appellant, committed the burglary. There was no evidence that called for any such charge. The testimony of Gordon and Secreast, the two parties who were with Davidson all that night, positively exclude the idea that Davidson committed the burglary. The fact that since the burglary Davidson had moved to Oklahoma, and that the sheriff had a subpœna for him and could not find him in Erath county, and that the boy who returned the knives to Kerr stated that he found them under the schoolhouse, was not sufficient evidence to found such a charge upon. The offense was committed the night of April 27, 1912. Appellant was indicted at the June term, 1912, and not tried until the subsequent term on December 17, 1912.

The judgment will be affirmed.