## H. G. WHITEHEAD v. THE STATE.

### No. 4367.   Decided March 14, 1917.

Rehearing granted May 9, 1917.

#### 1.—Swindling—Charge of Court—Requested Instructions.

Where, upon trial of swindling, the prosecutrix testified that she had a conversation with other parties and relied upon what they told her with reference to defendant's solvency, and the issue was thus raised that the prosecutrix did not rely altogether upon what defendant had told her of his solvency before she parted with the title of her property to him; and the court's charge simply submitted the question of false representation in a general way, limiting them to what defendant had told prosecutrix, and refused to submit the requested charge as to prosecutrix's conversation with other parties about selling the property described in the indictment to the defendant, etc., the same was reversible error. Prendergast, Judge, dissenting.

#### 2.—Same—Requested Charge—Misconception—Words and Phrases.

Where, upon trial of swindling, the issue was raised that the prosecutrix relied upon the representation, in part at least, which other parties had made to her concerning defendant's solvency, and the court refused a requested charge because it was therein stated that the prosecutrix must have relied solely and alone upon the statements made to her by the defendant, and thereby misconceived the requested charge which did not contain such a limitation, but simply asked the court to instruct the jury that if they relied upon other statements and representations, etc., to acquit the defendant, the requested charge should have been given. Prendergast, Judge, dissenting.

#### 3.—Same—Evidence—Other Transactions—Subsequent Insolvency.

Upon trial of swindling in which the indictment charged that the defendant obtained property from the prosecutrix upon the false representation that he was solvent, etc., it was reversible error to introduce evidence that subsequent to such transaction the defendant bought a farm and executed a mortgage on his property which included that which he had obtained from the prosecutrix. Prendergast, Judge, dissenting.

#### 4.—Same—Evidence—Schedule—Bankruptcy Proceeding—Bill of Exception.

Where, upon trial of swindling, in which the indictment charged that the defendant obtained property upon the false representation that he was solvent, etc., the State was permitted to introduce in evidence a great number of items in the schedule filed in bankruptcy proceedings by defendant and his brother, over a year after the purchase of the property by defendant from prosecutrix, upon which the charge of swindling is based, to show his insolvency at the time of the transaction, and the defendant excepted to such testimony. Held that the bill of exceptions, while not technically pointing out all the different illegitimate items, was nevertheless sufficient to present the question, and called the court's attention to the fact that the items to which he was objecting were those debts created since the transaction between himself and prosecutrix, and this did not contravene the rule that where some of the testimony mentioned in the bill of exceptions is admissible and some is not that the bill must particularize the matters to which objection was urged. Prendergast, Judge, dissenting.

#### 5.—Same—Insufficiency of the Evidence.

See opinion expressing doubt as to sufficiency of the evidence to sustain a conviction for swindling. Prendergast, Judge, dissenting.

Appeal from the District Court of Hood. Tried below before the Hon. J. B. Keith.

Appeal from a conviction of swindling; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Dean & Zweifel, Estes & Estes,* and *Martin & McDonald,* for appellant.—On question of introducing evidence of subsequent transaction of bankruptcy proceedings: Moody v. State, 24 Texas Crim. App., 458; Pinckford v. State, 13 id., 468; Allison v. State, 14 id., 402; Wilkerson v. State, 60 Texas Crim. Rep., 388, 131 S. W. Rep., 1108.

On question of refusing requested charge, as to representation as to third parties: Jones v. State, 13 Texas Crim. App., 1; Paulin v. State, 21 id., 436; Irvine v. State, 20 id., 12; Coleman v. State, 21 id., 520; Mayfield v. State, 23 id., 645; Gentry v. State, 24 id., 80; Thumm v. State, 24 id., 667; Blumm v. State, 6 Texas Crim. App., 592; McDaniel v. State, 63 Texas Crim. Rep., 260, 140 S. W. Rep., 232; Cline v. State, 77 Texas Crim. Rep., 281, 178 S. W. Rep., 520.

*E. B. Hendricks,* Assistant Attorney General, for the State.—On question of introducing in evidence schedule in bankruptcy: Davidson v. State, 12 Texas Crim. App., 219; Commonwealth v. Jeffries, 83 Am. Dec., 712; Commonwealth v. Drew, 153 Mass., 588; People v. Andre, 153 Mich., 531.

PRENDERGAST, JUDGE.—Appellant was convicted of swindling, and his punishment assessed at the lowest prescribed by law.

The evidence was conflicting, though taken as a whole, and especially that of the State, it was sufficient to sustain the conviction. The questions raised can be understood and decided without a statement of the facts proved. However, what further is necessary will be stated in discussing the questions. The alleged false representation made the basis of the conviction was in substance that appellant falsely and fraudulently represented to Miss Ada Karnes that he was not indebted to anyone in any amount, which she believed and relied upon and was thereby induced to part with title to and deliver possession of a horse worth $100 and a mule worth $75 to appellant on November 4, 1914, and to accept a note for $175, the value of said animals.

His first bill of exceptions shows that the court admitted in evidence over his objections, which were many, the schedule in bankruptcy of appellant and his brother, R. S. Whitehead, sworn to and subscribed by each of them and filed in the bankruptcy court in December, 1915. This schedule embraced a list of a large number of different items of indebtedness of different amounts owed by said Whiteheads to various and sundry persons, aggregating nearly $20,000. Many of these embraced items which showed that appellant was indebted to various persons before he induced Miss Ada Karnes on his representations to turn over to him her said stock and part with title thereto to him. This prior indebtedness aggregated not less, though probably much more,

than $5000. All of appellant's objections were to the introduction of said schedule at all. He made no objections whatever to any items of indebtedness shown by said schedule which may have been incurred by him subsequently to the obtaining of said animals from Miss Karnes. The court in allowing and approving appellant's bill on this subject did so with this qualification, which was accepted by him, towit:

"The schedule in bankruptcy was admitted by the court in evidence after it had been properly identified as having been signed and sworn to by the defendant and his brother R. S. Whitehead as admissions by them on the question of their insolvency, the indictment having alleged that they were insolvent, and they both, the defendant and R. S. Whitehead, afterwards testified as witnesses in the case and both admitted that they were insolvent at the time the note set out in the indictment was executed and continued in that condition to the date of trial. The defendant objected to the introduction of the schedules as a whole and the greater portion of the items in said schedule accrued prior to November 4, 1914, the date of the note set out in the indictment.

"The court overruled their objection to the schedule as a whole as he was not required to search through the items to discover whether there were any debts that were incurred subsequent to November 4, 1914. The statement in the bill of exception to the effect that the prosecuting witness, Ada Karnes, admitted on cross-examination that she relied upon the statements of Dr. Lancaster, Henry Zweifel and Mike Lewin about the deal with the Whiteheads, I do not certify as being correct. I have not the statement of facts before me, but my recollection of her testimony on this point is that she in substance testified that she had confidence in them and believed what they said to her, but in this connection she testified also that she would not have consummated the deal but for the statements made to her by the defendant."

It is unquestionably settled in this State that where evidence is introduced over an appellant's objections, some of which is admissible and some of it is not but all of it is together objected to, no error is shown. That in order to point out any error, the objection must be specifically to the particular portion which is inadmissible. Martin v. State, 189 S. W. Rep., 266, and these cases cited therein: Ortiz v. State, 68 Texas Crim. Rep., 526, 151 S. W. Rep., 1056; Payton v. State, 35 Texas Crim. Rep., 510, 34 S. W. Rep., 615; Gaines v. State, 37 S. W. Rep., 333; Tubb v. State, 55 Texas Crim. Rep., 623, 117 S. W. Rep., 858; Cabral v. State, 57 Texas Crim. Rep., 304, 122 S. W. Rep., 872; Hughes v. State, 68 Texas Crim. Rep., 587, 152 S. W. Rep., 912; Pinkerton v. State, 71 Texas Crim. Rep., 203, 160 S. W. Rep., 87; Boyd v. State, 72 Texas Crim. Rep., 523, 163 S. W. Rep., 67; Lopez v. State, 73 Texas Crim. Rep., 625, 166 S. W. Rep., 154; Francis v. State, 75 Texas Crim. Rep., 362, 170 S. W. Rep., 782; Zweig v. State, 74 Texas Crim. Rep., 306, 171 S. W. Rep., 751; Ghent v. State, 76 Texas Crim. Rep., 523, 176 S. W. Rep., 568; Aven v. State, 77 Texas Crim. Rep., 37, 177 S. W. Rep., 82; 1 Thomp. on Tr. (2d ed.), sec. 696. There can be no ques-

tion but that said schedule showing appellant's prior indebtedness was admissible even if some of the items of subsequent indebtedness may not have been admissible. The court's ruling was correct.

By another bill it is shown that appellant objected to the State's proving by appellant's said brother, R. S. (Bob) Whitehead on cross-examination that they had bought from another of their brothers in March, 1915, a tract of land on credit and gave their note to him for $7000, and to further secure it besides being a vendor's lien on the land they at the time executed to him a mortgage on all of their personal property, which included the mare and mule that they and appellant had obtained from Miss Ada Karnes. This testimony under the circumstances of this case and the bill as explained and qualified by the judge, which he accepted, and which is borne out by the record, was admissible. In explaining and qualifying the bill the court said:

"The testimony objected to and set out in the bill as to the $7000 note was elicited by the State on cross-examination of the defendant's witness Bob Whitehead, and proved by said witness that he and the defendant in March, 1915, executed a note to their brother for $7000, the same being a vendor's lien note and also secured said vendor's lien note by a mortgage covering all the personal property of the defendant and Bob Whitehead, and that after executing said mortgage that they disposed of practically all of it and then deeded the place back to their brother in cancellation of said note and before the said note became due, and this was admitted by the court as throwing whatever light it would upon the intent of the defendant to defraud the prosecuting witness, Ada Karnes, and the court thought it was material as tending to show that shortly after the creation of this debt that the defendant put all of his property beyond the reach of his creditors, thus rendering the note absolutely worthless, which the defendant and R. S. Whitehead had given to the witness Ada Karnes.

"That said testimony was also admissible on cross-examination for the purpose of showing the interest, the bias, and the credibility of the testimony of the witness R. S. Whitehead, and showing his relation to the defendant, and bearing upon his credibility.

"The court does not certify to the correctness of the statement in said bill as to the testimony of the State's witness Ada Karnes, as the statements made in the bill as to the testimony of said witness consist more or less as to the defendant's conclusion as to what she testified.

"The witness Ada Karnes did testify that she talked with Lancaster, Zweifel and Luring in regard to the proposed transaction with the defendant, but she stated that at the time she took the note that she relied upon what the defendant told her as to his financial condition and would not have taken the unsecured note of the defendant and his brother, R. S. Whitehead, for her property but for the statements made to her by the defendant as to their financial condition at the time the said note was executed.

"The witness Ada Karnes did not testify that she knew the defendant

owed Mike Luring at the time she took the note but she said she knew
he had been trading at Luring's store and having articles charged occa-
sionally, and that she knew nothing about what he owed, except what
he, the defendant, told her. That she had nothing to do with the
books at Luring's store. That she did not know whether he had settled
the account or not. The bill is allowed with the foregoing explanation."

By another bill appellant complains of the court's action in permit-
ting the State to introduce in evidence the summary of the schedule
of appellant and R. S. Whitehead in said bankrupt proceedings. Under
the explanation and qualification by the court of said bill said evidence
was admissible and the action of the court correct. The court's expla-
nation, accepted by appellant, was this:

"The indictment alleged that the defendant represented to the prose-
cuting witness that he had a number of items of property set out in
the indictment and that he did not owe anyone, that the prosecuting
witness relied on his statements that he was not indebted and took the
unsecured note of the defendant and R. S. Whitehead for a horse and
mule of the value of $175 and that the defendant's representation that
he did not owe anyone were false, and that he in fact did owe large
sums of money aggregating more than $5000, and was at said time
insolvent and that the other maker of said note, R. S. Whitehead, like-
wise was insolvent. The court admitted the summary of the schedules
in bankruptcy filed by the defendant and R. S. Whitehead after it had
been shown that said schedules had been signed and sworn to by the
defendant and R. S. Whitehead as showing, first, that the representa-
tions made by the defendant were untrue, and the schedules show this
representation to be untrue and to show that both the defendant and
R. S. Whitehead were at the time of the execution of said note insolvent
and said schedules did show that both the defendant and R. S. White-
head were insolvent at the time of the execution of said note. Being
voluntary bankrupts the court thought the schedules admissible under
the above facts as admissions of defendant."

The only other question necessary to be discussed is appellant's bill
wherein he objected to what he claims was an omission in the court's
charge and in connection therewith the refusal of his special charge on
the subject. The court explained and qualified his bill presenting
these matters, as follows:

"The court charged the jury in substance that before the defendant
could be convicted they must believe beyond a reasonable doubt that
in parting with the title of her property to the defendant she must
have relied upon and been induced by the statement alleged to be false
before a conviction could be had, and in substance gave the special
charges requested by the defendant and met all the exceptions to the
charge save and except the possible one embodied in a special charge
to the effect that Ada Karnes must have relied solely and alone upon
the statements made to her by the defendant. The statement contained
in the bill as to testimony of the witness Ada Karnes on cross-examina-

tion in so far as set out in question and answer form is certified to as correct but that portion of her testimony appearing in the bill of exceptions which is not in question and answer style I do not certify as being correct but refer to the statement of facts on this point."

The question raised by this assignment is whether or not the false representations of appellant to Miss Ada Karnes upon which she relied and which she believed, and without which she would not have parted with the title and possession of her said mare and mule to appellant, was the sole and only cause which induced her to so part with the title and possession of her property to appellant. Appellant insists that she must have so relied solely and alone before he could be convicted.

Our statute (art. 1421, P. C.) prescribing what is swindling: Swindling is the acquisition of any personal property by means of some false or deceitful pretense or device or fraudulent representation with intent to appropriate the same to the use of the party so acquiring.

It will be seen by this that our statute does not require by direct enactment nor by any proper inference therefrom that the false, etc., pretense or representation whereby one acquires the personal property of another shall be the sole and only inducing cause whereby such other is induced to and does part with the title and possession of his property. This court, and no other, has the right to inject into a statute what the Legislature has not enacted therein. No court has the right to add to or take from any statute prescribing an offense. If the Legislature in enacting this statute had intended that such false, etc., pretense or representation should be the sole and only means whereby one should be guilty of swindling another, it could and would have said so in plain and clear language, but it did not say so, and this court, and no other, can legally inject into it any such language either in specific words or by implication. Such requisite as is contended for by appellant herein is directly held against him by every modern or other American text-book writer.

In 19 Cyc., 407 (sub. b) it is laid down: "Although the pretense must be an inducing cause of the owner's parting with his property, it need not be the sole inducing cause; it is sufficient if it had material influence in inducing the owner to part with his property although he was also influenced in part by other causes." In support of this text cases are cited from Alabama, Arkansas, California, Georgia, Illinois, Iowa, Kansas, Louisiana, Massachusetts, Michigan, Mississippi, Missouri, Nebraska, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Virginia, Washington and Wyoming, and also from England and Canada. From many of these States and from England are cited more than one case—in some instances, several cases. An examination has not been made of all of these decisions from these different States and countries, but a good many of them have been examined, and in every instance they support the text in Cyc., and many of them discuss more fully the question.

Precisely the same is laid down as the law by such great and eminent

text-book writers as Bishop and Wharton. 2 Bishop's New Crim. Law, sec. 461; 2 Wharton's Crim. Law, sec. 1440. Mr. Bishop says: "All the decisions affirm that the false pretense need not have been the only inducement." Mr. Wharton says: "To require that the belief (in the false representation) should be the exclusive motive would exclude a conviction in any case; for in no case is any motive exclusive." Many of the cases from the States above enumerated are to precisely the same effect. It is unnecessary to encumber this opinion with quotations further from the authorities above cited.

The court's charge on this point required the jury to believe everything that was necessary or proper beyond a reasonable doubt before they could convict appellant. Appellant's special charge requested on this subject was correctly refused, because it did not present the law applicable to the point nor in this case.

On this point appellant only cited and relied upon two decisions of this court, Blum v. State, 20 Texas Crim. App., 578, and McDaniel v. State, 63 Texas Crim. Rep., 260. In neither of those cases did the question arise, nor was the point decided.

In the Blum case Presiding Judge White, who wrote the opinion for the court, said: "The sole question to be determined is, do the facts averred and the facts as proven constitute swindling?" Then he states the facts proven, which were to this effect: Blum had been in the habit of buying goods from Goodman, the prosecutor, and others upon credit prior to December 21st. He had used in his bakery and grocery business something over $1800 belonging to his wife and step-daughter. To pay them this debt, he on December 1st executed a deed to them of all of his property. This deed was executed in the forenoon, and when he left it with the clerk for registration he requested him to say nothing about it, as if known, it might affect or hurt him in his business. The same day and subsequently to this his wife and father-in-law started out on quite an extensive purchasing tour, visiting several stores and buying quite a quantity of goods at each, regardless of the price and having the bills charged to Blum. He was not present in a single instance when these goods were thus bought. When Goodman sold these goods, from his previous dealings with Blum and representations previously made to him by Blum and the fact that he was ignorant of his said sale of his property to his wife and step-daughter, he was still of the impression and belief that Blum owned said property and would not have extended him credit had he known that such was not the case. Under this state of fact, the court held that they were not sufficient to sustain a conviction. The court said: "No false pretenses in words are claimed to have been made by Blum; for he was not present in person and no false pretenses and declarations are shown to have been made by his wife and father-in-law, who acted as his agents in the purchase of the goods. That Goodman may have entertained the opinion that Blum still owned the property in the bakery and grocery and made the sale upon the belief that he still owned said property

can not affect the question, unless the acts of the parties purchasing the goods induced that belief at the time  It was simply an error of opinion on his part; and a knowledge of the fact that he was acting upon such belief or opinion without correcting it will not subject him or his agents to a charge of having made a false pretense by withholding the information which would have corrected his belief.  It was his own opinion as to the existence of a fact which did not exist and not the acts, declarations or representations of the parties with whom he was trading which caused him to be deceived." So that it is seen clearly that the point at issue was not whether Goodman in that case relied solely and alone upon any representations made to him by Blum, because the court specifically holds that as a matter of fact Blum made no representations to him at all, nor did his agents, his wife and father-in-law. However, in discussing the law generally, Judge White did state that the old English writer, Mr. Archbold, in his work on criminal practice and pleading, had said that it must appear by the evidence that the prosecutor parted with his title by means of the false pretenses alleged and that alone, but he immediately states that several States had held directly the reverse, citing several of the cases on that point collated by Cyc., above cited. It does not appear from the decision in the Blum case that it was either the opinion of Judge White or the court that Mr. Archbold had announced the correct rule, but, on the contrary, that the reverse of that, as held by the several decisions cited, was the true and correct rule.

What is said about the Blum decision is also applicable to the McDaniel decision. A reading of that case will demonstrate that the point at issue in this case was not at issue in that case but that the holding in that case and the opinion demonstrate that the alleged swindled party did not and could not have relied upon the claimed alleged false pretense, etc., and the case was reversed solely on that account.

The judgment is affirmed.

*Affirmed.*

ON REHEARING.

May 9, 1917.

DAVIDSON, PRESIDING JUDGE.—On a former day of this term the judgment herein was affirmed. Appellant has since filed a motion for rehearing setting up several reasons why this court was in error in the affirmance. It is urged that the trial court committed error in his original charge and refusal to give requested instructions. In order to review this question in the light of appellant's motion it may be necessary to make a statement of some of the facts.

Miss Karnes, the alleged injured party, testified, that she had a conversation with R. S. Whitehead, brother of defendant, with reference to selling him a mare and a mule. There were two of these conversations. Appellant was not present at either. Some time after these conversations to meet the agreement between herself and R. S. White-

head a note was prepared to be signed by R. S. Whitehead, appellant, and she says she understod that another brother, Rollie Whitehead, would also sign the note. On the 4th of November, 1914, the note was signed at the bank by appellant. She testified that at the time of the signing of the note she had a conversation with appellant. She said: "I read the note and told Grady that I wanted Rollie on the note. He said he didn't understand it that way; said Rollie would go on it all right, but there wasn't any use of it as he had five or six head of mules, seventy-five or one hundred head of hogs, a big crop and didn't owe anything. When he made these statements to me I thought he was telling me the truth and I took their note, Grady and Bob's note; they signed it and I gave the note to Mr. Nutt and went back to work. That is the note. Q. Was there anything said in that conversation about where the mare and mule colt were at that time? A. When I told Grady that I wanted Rollie on the note Bob said that he had done got the mare and mule; that he thought it was settled and he had done taken them to his place. I didn't know before that time that he had taken them. I had not authorized him to do so. This note has never been paid, and nothing has been paid on it. These representations were made to me here at the First National Bank in Granbury, Hood County, Texas. I believed what Grady told me about his financial condition. I would not have taken their unsecured note for this property if he had not made those statements to me." From the facts it appears that R. S. Whitehead had already signed the note.

Appellant testifying to this phase of the case stated: "I have heard the testimony in regard to a certain note that I executed to Miss Ada Karnes on the 4th of November, 1914. I signed that note in the First National Bank here. I did not have any conversation with Miss Ada Karnes at the time or prior to the time I signed the note regarding the purchase of the property. I very likely saw her the day I signed the note. I usually see her every time I am in town. I did not that day or any other day undertake to tell her how much stuff I had. I did not tell her how many horses, mules, cattle or hogs that I had. I did not tell her how much I owed nor how much Bob owed. I did not tell her how much stuff, such as mules, horses, etc., that Bob owned. I made no statement similar to that. I had no conversation with her prior to the note about what she would require as security. I had no conversation with her about the note. I signed the note in the First National Bank and I think I was standing near the stove at a part of the desk that is near there. Jeff Nutt handed me the note and I signed it and I think handed it back to him. I had no intention at that time of defrauding her or swindling her out of the value of this property. Prior to that time I had been buying mules and horses and stock and dealing in them all my life.".

Jeff Nutt was not placed upon the stand and his testimony in regard to the transaction in the bank is not in the record. The conversations she had had about the trade prior to this transaction in the bank were

had with R. S. Whitehead in the absence of appellant. Further testifying, Miss Karnes stated: "The matter was finally consummated in the First National Bank. He said that he and Grady would make the note. Jeff Nutt drew up the note and Grady brought it into the lobby of the bank and I read it and asked him for Rollie on the note, and when he made these statements about having five or six mules and seventy-five or one hundred head of hogs and owed nobody I accepted them on the note."

In this connection another phase of the testimony may be necessary to mention in order to understand the issue brought into the case by reason of the court's charge and refusal to give requested instructions. Miss Karnes testified: "I talked to Dr. Lancaster and Henry Zweifel in regard to the sale. I didn't talk to Mrs. Rosa Blake about this sale or in her presence. I may have said something to Mike Luring about it. I was working at Luring's store at the time, the Famous. I asked him what he thought about it and he said he thought it was perfectly safe to sell them. I asked Mr. Luring about my selling Bob and Grady this mule and horse; he said he thought it was perfectly safe. I stated a while ago that up to the consummation of the note I thought I was going to get Rollie on it. Q. How came you to ask Luring what he thought about selling this property to them and taking their note? A. Just because I asked him. Although I was expecting to get Rollie on the note, I asked Mr. Luring about taking the note because I wanted his advice. I consulted with him some time after my first conversation with Bob. It was between the first and second conversations that I talked with Uncle Mike. I don't remember talking to him any more about the transaction. I don't remember asking Uncle Mike in that conversation whether or not he knew Grady owed anything. He told me he thought it was perfectly safe to take Bob and Grady's note for the stock. He thought they were safe. I don't know that I relied on his advice. I went to him through force of habit. Q. Is it not a fact that you would not have gone to him and asked his advice if you were not willing to rely on it? A. Yes, sir; I did. I was working for him at the time this note was consummated, selling goods. Yes, sir; I stated that Grady told me at the time he signed this note that he didn't. owe anything. I knew there was something on the books at Mr. Luring's against Grady, not much. Q. If he stated that he didn't owe anything, now you say that you knew he did owe Mr. Luring? A. I knew he owed some, not how much. I just stated the facts of the case. I knew he owed Mr. Luring some, not how much. If I had thought of it that way, I would have known his statement to me was not true. I did rely on his statements, just like I told you a while ago. I had sold Grady some goods and had charged them to him I think. I don't think I sold him numbers of times. Grady did not do most of his trading with me. I know that he got some things on a credit there. I relied on Grady's statement when he told me he didn't owe anything; I knew at that time he owed a little something at the

store, but I didn't think of it.  Q.  If it was not true you could not
rely on it, if he made that statement to you that he didn't owe any-
thing and you knew at the time that he did owe Mr. Luring, you didn't
rely on his statement?  A.  I did; yes, sir; knowing that it was not
true, because I didn't think of it at the time"  Her testimony goes
further and shows that she talked with Mr. Zweifel and Dr. Lancaster
before the note was executed.  In reference to Dr. Lancaster Miss
Karnes testified·  "I talked to Dr. Lancaster before the note was exe-
cuted    I asked Dr. Lancaster about selling them and he said that he
had done the same thing or was going to do the same thing or had
sold them, I don't know which; and that they were not involved; that
they told him they were not involved.  I knew they had an account at
Luring's store    I didn't know they owed anybody else.  I had never
heard their credit questioned.  I relied on what Dr. Lancaster said.
He advised me that he believed they would pay me.  I had that in
mind when I took their note and was relying on it at the time.  I don't
remember who else I advised with about the matter.  I talked to Dr.
Lancaster and Mr. Zweifel and Mr. Luring and relied on their advice.
I believed what they told me and I had that in mind and was relying
on it at the time I took the note."  On re-cross this same witness tes-
tified:  "Yes, sir; I was relying on the statements of these other people
at the time I made this sale, but I would not have sold to them with
Rollie on the note if Grady hadn't told me that.  I don't know whether
I asked Dr. Lancaster anything about Rollie or not.  I don't remember
to have asked Mike Luring and Henry Zweifel about Rollie.  Bob and
Grady were the ones I was asking about."

The court charged the jury as follows:  "If you do not so believe
and find, beyond a reasonable doubt, you will acquit the defendant, or
if you have a reasonable doubt as to whether or not Ada Karnes believed
the said representation, if any, made to her by the said H. G. White-
head, to be true and was induced thereby to part with the possession
and title to said mule and horse, then, and in that event you will like-
wise acquit the defendant.

"Again, if you have a reasonable doubt as to whether or not the said
H. G. Whitehead made the representations to the said Ada Karnes
alleged in the indictment or if he did make them, and you believe they
were false and the said Ada Karnes knew they were false when she
parted with the title and possession of said mule and horse, then in
either event you will acquit the defendant."

Preceding the charges above quoted the court, in substance, without
setting it out, charged that if appellant fraudulently represented to
Miss Karnes that he was not indebted to any person, and that by means
of such false and fraudulent representations, if any, the said Ada
Karnes was induced to sell and deliver to the said H. G. Whitehead
and Bob Whitehead the title and possession of one horse and one mule,
and to accept for the animals a promissory note unsecured and signed
by H. G. and R. S. Whitehead, and they further should believe that

H. G. Whitehead was indebted to other persons and was not solvent and that Bob Whitehead was insolvent, and that said representations made, if any, by H. G. Whitehead were false, and that in truth and in fact he was largely indebted and owed large amounts aggregating more than five thousand dollars, and that the said Ada Karnes, in parting with the title and possession of the said mule and horse, believed said representations, if any were made, to be true and was induced thereby to part with the possession and title to said property, and that the value of said property was more than fifty dollars, and so on, they should convict. Appellant excepted to the charge above quoted and requested the court to charge the jury as follows:

"Gentlemen of the jury, in this cause I charge you at the request of defendant's counsel that if you find and believe that the prosecuting witness, Ada Karnes, before accepting the note set out and described in the indictment herein, advised with Henry Zweifel, Mike Lewin and J. R. Lancaster, or either of them, about selling the property described in said indictment to the defendant, Bob Whitehead, and accepting their unsecured note for the price of same and that she acted on said advice, if any, at the time she accepted said note, if she did, or if you have a reasonable doubt as to whether she did so act on said advice, if any, you will acquit the defendant and say by your verdict not guilty."

This charge was refused. It is unnecessary to set out the facts further than has been stated. The court's qualification to the bill of exceptions reserved is as follows: "The court charged the jury, in substance, that before the defendant could be convicted they must believe beyond a reasonable doubt that in parting with the title of her property to the defendant she must have relied upon and been induced by the statement alleged to be false before a conviction could be had, and in substance gave the special charges requested by the defendant and met all the exceptions to the charge save and except the possible one embodied in a special charge to the effect that Ada Karnes must have relied solely and alone upon the statements made to her by the defendant. The statement contained in the bill as to testimony of the witness Ada Karnes on cross-examination in so far as set out in question and answer form is certified to as correct, but that portion of her testimony appearing in the bill of exceptions which is not in question and answer style I do not certify as being correct but refer to the statement of facts on this point." The writer is of opinion, after reading the record, that the bill of exception does correctly state her testimony about which the court refers to the statement of facts. The court in his qualification seems to have misconceived the charge requested by appellant in using the language that that special charge suggested that Miss Karnes "must have relied solely and alone upon the statements made to her by the defendant." The charge has been quoted, and the court in that qualification certainly misunderstood the charge, because it does not ask that the jury be instructed to rely solely

upon the statements of the defendant made to Miss Karnes. The charge simply asked the court to instruct the jury as stated by its terms, that if she relied upon the statements and representations of the three gentlemen named, or there was a reasonable doubt about it, appellant was entitled to an acquittal. This charge was called for by the facts heretofore stated. She testified she talked with these gentlemen and relied upon what they told her, and this occurred before the execution of the note. This advice, which she says was at her own suggestion from those gentlemen, indicated that she was not willing to trust defendant on their statements and sought the advice of the other named parties. This charge should have been given. It was an issue in the case. If appellant had requested the court to charge that she must rely solely and alone upon the statements of defendant, we would have had the question presented in a different light, but as that question is not presented by the requested charge, it is not discussed.

There is another bill of exceptions reserved to the introduction of evidence to the effect that appellant bought a farm for seven thousand dollars. He paid nothing on the seven thousand dollars in cash, but gave vendor's lien notes for that amount and in addition executed a mortgage on his stock. Whether this horse and mule were included in that is not shown, unless it be under the general statement that he gave a mortgage on all of his stock. In this connection the evidence shows that this debt was cancelled later by deeding the farm back to his brother and receiving a release of the mortgage given on the stock. Some of the reasons urged why this matter should not have gone before the jury should have been sustained. The facts show and the bill shows that this indebtedness accrued months after the execution of the note to Miss Karnes, which was for $175, and could not have had any effect upon the indebtedness of appellant at the time he bought the horse and mule from Miss Karnes. This case is based upon the proposition: that is, the court only submitted the theory that appellant was insolvent at the time he made the purchase, or rather at the time he made the representations to Miss Karnes, which she claimed to have been made by him, to the effect that he did not owe anything. The court did not submit the statements that he owned five or six mules and seventy-five to one hundred hogs. These were excluded, and were not even mentioned in the charge. He certainly did not owe this amount at that time, because the facts show plainly that that transaction occurred months after he executed the note to Miss Karnes. Just how this could affect the insolvency of appellant at the time he executed the note is not readily explainable. Where a party is solvent at the time of the contract and subsequently becomes insolvent, the subsequent insolvency would generally not enter into prior statements of solvency. It would hardly be held that appellant entered into this contract with his brother some months afterward for seven thousand dollars with a view of beating Miss Karnes out of $175 that he owed her; but if he did, that would not be swindling, because the contract

and swindling, if any, had already occurred and the property had passed to appellant. Having acquired the property he had the right to use it; it became his when he gave the note for it. The fact that he may have used it subsequently in trading, making contracts, etc., would not render him insolvent at the time he purchased the mule and horse. He did not then owe the seven thousand dollars. That debt was cancelled long before the maturity of the Karnes note. This matter upon another trial should not be permitted to go to the jury.

There is another question, towit: the introduction of a great number of items in the schedule filed in the bankruptcy proceedings which were filed by appellant and his brother Bob over a year after the purchase of the horse and mule. This bill is very lengthy and recapitulates and recites a great number of transactions some of which appellant owed at the time of the purchase of the horse and mule and execution of the note therefor. A great number of the items were debts contracted long subsequent to the transaction with Miss Karnes. In the original opinion we passed this out with the statement that the items to which objections were made must be specifically specified, otherwise the court will not look through to ascertain which were and which were not admissible. This is based upon the rule that where some of the testimony mentioned in a bill is admissible and some not the bill must particularize the matters to which objection was urged. Recognizing that rule the writer is of opinion that this bill, while not technically pointing out all these different illegitimate items, is sufficient to present the question. Among other exceptions stated to the introduction of this evidence this is found: The contract upon which the defendant is charged by indictment with swindling was entered into between the parties prior to the date of the items shown on the schedule, and the prosecuting witness knew at the time she entered into the contract that he, the defendant, did owe something, and further that she was relying not on these statements as the indictment alleges but on the testimony of three different parties, towit: Dr. J. R. Lancaster, Mike Lewin and Henry Zweifel; that, therefore, the testimony can not be offered for any purpose in view of the assignments in the indictment and under the law except for the purpose of prejudicing the minds of the jury against the defendant, and that the items taken from said schedule and the schedule itself were not admissible on account of being an ex parte proceeding. This is one of the grounds. Another ground is that the items shown in said schedule were evidences of debt created after the execution of the note given by the defendant to the prosecuting witness, Ada Karnes, which note and the transaction out of which it grew are the basis of this prosecution; and because the proof shows that these items of debt were not in existence at the time of the execution of said note; and because said testimony is immaterial and does not sustain any charge made in the indictment, and are immaterial to any issue in the case and could serve no purpose except to prejudice the minds of the jury against the defendant; that the items objected

to were created after the execution of the note given to Ada Karnes, and because said testimony could not in any manner have influenced the prosecuting witness, Ada Karnes, when she sold the property to the defendant and took his note therefor. These are just mentioned in passing. The writer is of the opinion that these, while not very specific, were sufficiently so though to call the court's attention to the fact that the items to which he was objecting were those debts created since the transaction between himself and Miss Karnes. The trial court qualifying the bill, among other things, stated he did not feel called upon to go through all the schedule, which was rather an extensive one, and cull out the items of debt which occurred between appellant and Miss Karnes after the transaction. It was not necessary for him to do so. He was the presiding judge; he heard the testimony read to the jury and the dates of the items as they were called in reading the matter to the jury. Appellant while not specifying each item, in a general way called his attention to the fact he was objecting to all those items in which debts occurred after the transaction alleged in the indictment. The date of this transaction was the 4th of October, 1914. Many of the items occurred at varying times during a year or more after the transaction declared upon in the indictment. The writer is of the opinion that that was specific enough to call the court's attention to the fact that these items were referred to in the objections by appellant. The court could have required the State to eliminate such items at the time they were read to the jury, and could also have confined the State to debts existing at the time of the execution of the Karnes note, and if the schedule in bankruptcy was admissible at all for any purpose, then certainly no other items as this record presents it should have been admitted except those specifying debts that were in existence at the time of giving Miss Karnes the note relied upon in this transaction. But if he is in error in regard to the sufficiency of the bill to present these matters, then upon another trial all such matters occurring subsequent to the transaction set out in the indictment should be excluded. The matter at issue was whether or not appellant owed anything at the time he made the statement to Miss Karnes. This was the theory upon which the case was tried under the court's charge. Certainly it could not be held to be proper to introduce evidence of indebtedness incurred by appellant after the execution of the note. He did not and could not have owed subsequent debts at the time of the execution of the note; therefore, it could not have been a misrepresentation as to such subsequent debts.

These matters have been treated in a general way in view of the motion for rehearing. There are many other facts and details in evidence which would throw light upon these matters which are not herein mentioned or discussed. The writer does not believe that the facts show a case of swindling. To his mind this is just a credit sale evidenced by the note mentioned by the witness Miss Karnes. I do not care to go into a detail of the facts bearing on it further than as stated.

This note was executed on the 4th of November, 1914, and matured before the bankruptcy proceedings were instituted which occurred in December, 1915. This indictment was not preferred until the 25th of April, 1916. That appellant's credit was good at the bank and in the community where he was dealing seems not to be questioned, and the unfortunate matters occurring during 1915, and the reduction of the price of cotton and matters of that sort, forced appellant into bankruptcy. He had always sustained a high rating as a business man up to the time of the bankruptcy, or just before it, and it is shown that he raised in 1915 something over one hundred bales of cotton, but on account of existing circumstances, the war in Europe and matters of that sort, cotton was reduced to a very low value. It seems to be not questioned that if the cotton had sold at the subsequent high prices he would have been able to have avoided bankruptcy and paid his debts. To the mind of the writer this record does not show evidence which would justify the conclusion that appellant in signing the note or buying the horse and mule intended to defraud Miss Karnes. It was a credit sale and not a swindle.

For the reasons indicated the motion for rehearing is granted, the judgment of affirmance set aside, and the cause reversed and remanded.

*Reversed and remanded.*

PRENDERGAST, JUDGE (dissenting).